770 F.2d 316
 10 Soc.Sec.Rep.Ser. 375, Medicare&Medicaid Gu 34,846
Gloria DeJESUS, individually and on behalf of all others
similarly situated, Plaintiff-Appellee,
v.
Cesar PERALES, as Commissioner of the New York State
Department of Social Services, W. Burton
Richardson, as Director of the Monroe
County Department of Social
Services,
Defendants-Appellants.
 Nos. 1365, 1376, Docket 85-7327, 85-7345.
 United States Court of Appeals,
Second Circuit.
 Argued June 13, 1985.
Decided Aug. 12, 1985.
 
 Alan W. Rubenstein, Asst. Atty. Gen., Albany, N.Y. (Robert Abrams, Atty. Gen. of State of New York, Robert Hermann, Sol. Gen., William J. Kogan, Asst. Sol. Gen., Albany, N.Y.), for defendant-appellant Perales.
 Milo A. Tomanovich, Chief Legal Counsel, Rochester, N.Y. (James A. Robinson, Sr. Social Services Counsel, Rochester, N.Y.), for defendant-appellant Richardson.
 Rene H. Reixach, Greater Upstate Law Project, Rochester, N.Y. (Edwin J. Lopez-Soto, Monroe County Legal Assistance Corp., Rochester, N.Y.), for plaintiff-appellee.
 John F. Cordes, Atty., Appellate Staff, Civil Div., Dept. of Justice, Washington, D.C. (Richard K. Willard, Acting Asst. Atty. Gen., Washington, D.C., Salvatore R. Martoche, U.S. Atty., Buffalo, N.Y., Nicholas S. Zeppos, Atty., Appellate Staff, Civil Div., Dept. of Justice, Washington, D.C.), for Secretary, Dept. of Health and Human Services, as amicus curiae.
 Before FRIENDLY, OAKES and WINTER, Circuit Judges.
 FRIENDLY, Circuit Judge:
 
 
 1
 This appeal from a judgment of the District Court for the Western District of New York relating to the Medicaid program raises close questions, described below, which are of great concern to the "medically needy" on the one hand, and the State of New York[1] and the United States on the other.
 
 The Proceedings Below and in this Court
 
 2
 This action was brought by Gloria DeJesus, a citizen of the United States and a resident of Monroe County, New York, against Cesar Perales, Commissioner of the New York State Department of Social Services, and W. Burton Richardson, Director of the Monroe County Department of Social Services.
 
 
 3
 The statutory background is as follows: Medicaid, enacted in 1965 as Title XIX of the Social Security Act (the Act), 42 U.S.C. Sec. 1396 et seq. (1982),[2] is a co-operative federal/state cost-sharing program designed to enable participating states to furnish medical assistance to persons whose income and resources are insufficient to meet the costs of necessary medical care and services. There are two sets of eligible persons. The "categorically needy" are persons eligible for cash assistance under two federal programs: Aid to Families with Dependent Children (AFDC), Sec. 601 et seq., and Supplemental Security Income (SSI), Sec. 1381 et seq.[3] Participating states must provide Medicaid coverage to the categorically needy, Sec. 1396a(a)(10)(A). The "medically needy" are persons who meet the non-financial eligibility requirements for cash assistance under AFDC or SSI, but whose income or resources exceed the financial eligibility standards of the relevant program. This appeal concerns persons who, but for income or resources, would qualify for AFDC; they are known as "AFDC-related medically needy." Participating states may, at their option, provide Medicaid coverage to the medically needy, Sec. 1396a(a)(10)(C). States that do so must establish "reasonable" Medicaid income standards[4] for testing financial eligibility and must use "flexibility" in the application of these standards by allowing medically needy persons whose income exceeds the standard to "spend down" their excess income by incurring medical expenses[5] equal to or greater than the excess, Sec. 1396a(a)(17). Persons who meet their spend-down for a given period are eligible to receive Medicaid for the remainder of that period without any further spend-down.
 
 
 4
 New York joined the Medicaid program in 1966, authorizing the New York State Department of Social Services (NYSDSS) to establish a Medicaid plan covering both the categorically and the medically needy, 1966 N.Y. Laws, ch. 256, as amended N.Y.Soc.Serv. Law Sec. 363 et seq. Defendants submitted below an affidavit of Richard T. Cody, Assistant Commissioner in the Division of Medical Assistance of NYSDSS, which supplied information, much of it uncontested, about the operation of Medicaid in New York. To determine the amount that an AFDC-related medically needy person is required to spend down before becoming entitled to Medicaid coverage of inpatient hospital expenses, NYSDSS computes the person's monthly excess income prospectively for a period of six months. 18 New York Code Rules & Regulations Sec. 360.5(d)(1) (1985) [hereafter N.Y.C.R.R.]. If the person's prospective income changes during the spend-down period, the spend-down is adjusted to reflect the actual amount of income available to him. After the person has incurred medical expenses equal to his spend-down, he will be eligible to receive Medicaid for the remainder of the spend-down period. In contrast, NYSDSS determines financial eligibility for AFDC by measuring a person's income for a single month against the cash assistance standard for one month, Sec. 602(a)(13)(A)(i). If the person qualifies for AFDC in a given month, he is categorically needy and is entitled to full Medicaid coverage of all medical expenses, including inpatient hospital expenses, incurred in that month.
 
 
 5
 The complaint alleges that Mrs. DeJesus' family consists of her husband and his three minor children. Their gross income, consisting of her husband's workman's compensation and social security disability benefits, amounted to $729.77 per month, as compared with New York's income standards for Medicaid and for cash assistance in 1984 of $575 and $578.93 per month, respectively. Since NYSDSS must use the higher of the two standards in determining eligibility for Medicaid, 18 N.Y.C.R.R. Sec. 360.5(c)(7), it calculated the family's excess income to be $151 per month and their spend-down for inpatient hospital care to be six times this, or $906. The complaint further alleges that in October 1984 Mrs. DeJesus and one of the children were found to require surgery, apparently of non-emergency character, but that the operations had to be canceled because the family was unable to pay a preadmission deposit equal to their entire spend-down of $906. Later, after being informed that New York's six-month spend-down requirement would be challenged in the courts, another hospital agreed to perform the operation on plaintiff upon payment of a preadmission deposit equal to her spend-down for one month, or $151.
 
 
 6
 This action was brought as a class action on behalf of Mrs. DeJesus and "a class consisting of all AFDC-related medically needy applicants for or recipients of Medicaid who have been, are being or will be subjected to defendants' six-month spend-down requirements in order to qualify or requalify for Medicaid benefits" for inpatient hospital care. Plaintiff alleges that New York's six-month spend-down requirement violates Sec. 1396a(a)(10)(C)(i)(III), which provides that a state's plan to furnish Medicaid to the medically needy must set forth
 
 
 7
 the single standard to be employed in determining income and resource eligibility ... and the methodology to be employed in determining such eligibility, ... which shall be the same methodology which would be employed under ... the appropriate State [cash assistance] plan ... to which such group is most closely categorically related ...,
 
 
 8
 and Sec. 1396a(a)(17), which provides that the plan must
 
 
 9
 include reasonable standards (which shall be comparable for all groups ...) for determining eligibility for and the extent of medical assistance under the plan which (A) are consistent with the objectives of this subchapter, (B) provide for taking into account only such income and resources as are, as determined in accordance with standards prescribed by the Secretary, available to the applicant or recipient ... [and] (C) provide for reasonable evaluation of any such income or resources ....
 
 
 10
 After answer the parties stipulated to class certification. Both sides then moved for summary judgment. Plaintiff's motion was supported by affidavits of her attorney and herself, which added nothing to the complaint except that Mrs. DeJesus had agreed to pay the hospital performing the surgery the balance of $755 on her six-month spend-down if the court did not order payment by Medicaid.
 
 
 11
 Defendants' motion was supported by the Cody affidavit mentioned above. Cody averred that his colleagues in the Division of Medical Assistance had not received complaints from the medically needy that they were unable to receive necessary hospital care because of the computation of the spend-down, and that in 1984 approximately $175,000,000 had been spent in providing hospital care to the AFDC-related medically needy. He referred to Sec. 2805-b of New York's Public Health Law, which requires every general hospital to admit any person in need of immediate hospitalization with all convenient speed and not to question such person or any member of his or her family concerning insurance, credit or payment of charges before admission. He also pointed out that the medically needy may have their spend-down forgiven by a hospital under the Hill-Burton Act, Sec. 291 et seq. See Gadway v. Blum, 567 F.Supp. 772 (N.D.N.Y.1983).
 
 
 12
 Cody also stated that the Bureau of Budget Management in NYSDSS had estimated that changing from a six-month to a one-month spend-down for AFDC- and SSI-related recipients would cost from $25,000,000 to $30,000,000 annually simply as a result of the 5/6 reduction in spend-down amounts that such a change would bring for the medically needy currently receiving Medicaid. Beyond that, a change to a one-month spend-down would substantially increase the number of people with excess income who would be eligible to receive Medicaid. NYSDSS projected the total additional expenditure at $78,000,000 annually.
 
 
 13
 Both sides submitted briefs and largely rested upon them. The judge then announced, "I am going to grant the Plaintiff's motion for summary judgment for the reasons cited in Plaintiff's Memorandum of Law." On April 19, 1985, judgment was entered ordering that the action be maintained as a class action; decreeing "that defendants' policy and practice of using a six-month period for calculating the income of AFDC-related medically needy applicants for and recipients of Medicaid, pursuant to 18 N.Y.C.R.R. Sec. 360.5(d)(1) violates 42 U.S.C. Sec. 1396a(a)(10)(C)(i)(III) and 42 U.S.C. Sec. 1396a(a)(17);" and ordering "that defendants, their agents, employees and assigns are permanently enjoined from using a longer period for calculating the income of AFDC-related medically needy applicants for and recipients of Medicaid, than is used for AFDC recipients categorically eligible for public assistance and Medicaid." Defendants were further ordered to "cause retroactive benefits to be paid for class members who in the past have had spend-downs computed under the policy challenged in this action in accordance with a plan to be submitted by counsel for plaintiffs and defendants." The court directed that plaintiffs should receive attorney's fees from defendant Perales on motion of plaintiffs after the termination of any appeals from the judgment. Upon the filing of a notice of appeal, enforcement of the judgment was to be stayed until April 30, 1985, or such further period as this court might grant. Counsel later agreed to an extension of the stay pending an appeal, which we expedited at their request. The Secretary of the United States Department of Health and Human Services (HHS) filed a brief as amicus curiae pursuant to FRAP 29 in support of appellants and was allowed to participate in oral argument.
 
 DISCUSSION
 
 14
 This appeal requires the interpretation of a statute of unparalleled complexity. The conditions which a state Medicaid plan must meet, now specified in Sec. 1396a(a), have grown from the original twenty-two in the 1965 Act to forty-six, almost all of which contain a number of subdivisions, exceptions and qualifications. The Supreme Court has characterized the Social Security Act as "among the most intricate ever drafted by Congress" and has quoted with approval our observation in Friedman v. Berger, 547 F.2d 724, 727 n. 7 (2 Cir.1976), cert. denied, 430 U.S. 984, 97 S.Ct. 1681, 52 L.Ed.2d 378 (1977), that the Act is "almost unintelligible to the uninitiated." Schweiker v. Gray Panthers, 453 U.S. 34, 43, 101 S.Ct. 2633, 2640, 69 L.Ed.2d 460 (1981). In endeavoring to penetrate this maze, courts must guard themselves against the temptation of allowing a literal reading of a relatively recent amendment to set at naught the experience of administrators acquired over a score of years.
 
 
 15
 The basic thrust of the argument made by New York and supported by the Secretary is that, in the very nature of things, as must have been known by Congress, there cannot be identity in treatment between categorically needy persons eligible for AFDC and the AFDC-related medically needy. Persons eligible for AFDC in a given month are, by definition, earning no more in that month than is required for the basic necessities of life, excluding medical expenses. If they also incur medical expenses during that month, they must immediately receive Medicaid, since otherwise payment of these medical expenses would eat into funds required for basic necessities. The AFDC-related medically needy differ in that their monthly income is deemed more than sufficient to pay for the basic necessities of life--in Mrs. DeJesus' case by a marginal amount, in other cases by more. Plaintiff therefore does not dispute the propriety of a state's insisting that the AFDC-related medically needy make available their excess income to meet incurred medical expenses before becoming eligible to receive Medicaid benefits. Once they have spent down their excess income, but only then, are they in roughly the same position as persons eligible for AFDC: any further expenditures for medical expenses would have to come out of funds required for basic necessities. Indeed, Sec. 1396a(a)(17), which has been part of Title XIX in practically the same form since its enactment, see Pub.L. No. 89-97, Sec. 1902(a)(17), 79 Stat. 346 (1965), and provides that a state Medicaid plan must
 
 
 16
 include reasonable standards (which shall be comparable for all groups ...) for determining eligibility for and the extent of medical assistance under the plan ... and provide for flexibility in the application of such standards with respect to income by taking into account, except to the extent prescribed by the Secretary, the costs (whether in the form of insurance premiums or otherwise) incurred for medical care or for any other type of remedial care recognized under State law ...,
 
 
 17
 expressly requires states to allow the medically needy the opportunity to qualify for Medicaid by spending down their excess income.[6] The dispute in this case is whether a state may permissibly decide that when the AFDC-related medically needy incur a certain type of medical expense--here, for inpatient hospital care--the spend-down should be calculated by taking into account a family's projected income over a six-month period, rather than over the one-month period that the state must use, Sec. 602(a)(13)(A)(i), in determining whether a family is eligible for AFDC.
 
 
 18
 New York has required a six-month spend-down for coverage of inpatient hospital expenses in one form or another since the inception of its Medicaid program.[7] NYSDSS defends this requirement as necessary to target limited public funds for medical assistance at those who need it most. NYSDSS notes that inpatient hospital care is generally much more expensive than other types of medical care, and individuals tend to incur the costs of inpatient hospital care on a lump-sum basis within a single month even if the care itself extends over a longer period. Using a one-month spend-down for inpatient hospital expenses, NYSDSS maintains, would mean that individuals with relatively high monthly incomes might qualify for Medicaid coverage of a substantial part of a larger hospital bill received in a single month, even though such individuals would have excess income in subsequent months that could be used to help pay the bill. In contrast, with its six-month spend-down requirement NYSDSS ensures that only the "most" needy of the medically needy will receive Medicaid benefits, since by definition their excess income is so little that even six months' worth is insufficient to pay significant incurred hospital expenses.
 
 
 19
 The Secretary's regulations plainly permit what New York has done. 42 C.F.R. Sec. 435.831 (1984), entitled "Income Eligibility," says:
 
 
 20
 The [state Medicaid] agency must determine income eligibility of medically needy individuals in accordance with this section. The agency must use a prospective period of not more than 6 months to compute income.[8]
 
 
 21
 Subdivision (c) provides that if countable income exceeds the applicable income standard, the state agency must deduct, in a certain order, various incurred medical expenses. Subdivision (d), entitled "Eligibility based on incurred medical expenses," provides that "[o]nce deduction of incurred medical expenses reduces income to the income standard, the individual is eligible for Medicaid."[9]
 
 
 22
 "Comparability"
 
 
 23
 We see little force in plaintiff's contention that New York's six-month spend-down requirement violates the "comparability" language of Sec. 1396a(a)(17). Although Sec. 1396a(a)(17)--a single sentence stretching over 54 lines in the United States Code--achieves a degree of incomprehensibility unusual even for Title XIX, at bottom it is a general command that states fix reasonable income eligibility standards for the medically needy. These standards are to be generally the same as in the AFDC and SSI programs. See, e.g., Beltran v. Myers, 701 F.2d 91 (9 Cir.) (transfer of assets rule for Medicaid invalidated), cert. denied, 462 U.S. 1134, 103 S.Ct. 3115, 77 L.Ed.2d 1369 (1983); Calkins v. Blum, 675 F.2d 44 (2 Cir.1982) (different income disregards held invalid); Caldwell v. Blum, 621 F.2d 491 (2 Cir.1980) (transfer of assets rule for Medicaid invalidated), cert. denied, 452 U.S. 909, 101 S.Ct. 3039, 69 L.Ed.2d 412 (1981); Fabula v. Buck, 598 F.2d 869 (4 Cir.1979) (same); Greklek v. Toia, 565 F.2d 1259 (2 Cir.1977) (different treatment of work-related expenses held invalid), cert. denied, 436 U.S. 962, 98 S.Ct. 3081, 57 L.Ed.2d 1128 (1978).[10] However, since the very purpose of Sec. 1396a(a)(17) is to regulate the standards under which persons having incomes higher than allowed in the cash assistance programs may still qualify for Medicaid, it cannot be read to require that the standards must be the same as those in the cash assistance programs in all respects. The direction is that the standards shall be "comparable," not identical, for all groups. Comparison invites an examination of differences as well as resemblances.[11] As the Supreme Court pointed out in Schweiker v. Hogan, 457 U.S. 569, 587, 102 S.Ct. 2597, 2608, 73 L.Ed.2d 227 (1982), the comparability provisions of Title XIX, including those in Sec. 1396a(a)(17), "did not require that the medically needy be treated comparably to the categorically needy in all respects." Furthermore, as previously pointed out, Sec. 1396a(a)(17) invites "flexibility" in applying income standards to the medically needy by taking into account their costs of medical care, except to the extent prescribed by the Secretary. Read together, the requirements of "comparability" and "flexibility" imposed by Sec. 1396a(a)(17) simply do not mandate the rigidly identical treatment of categorically and medically needy Medicaid recipients for which plaintiff contends.
 
 
 24
 "Same Methodology"
 
 
 25
 With this behind us, we turn to the more difficult question raised under the "same methodology" language of Sec. 1396a(a)(10)(C)(i)(III) [hereafter, for simplicity, "III"]. A review of the legislative development is essential.
 
 
 26
 The counterpart of today's Sec. 1396a(a)(10)(C)(i) in the 1965 Act was Sec. 1902(a)(10)(B)(i). This said that if a state chose to extend medical assistance to the medically needy it must provide
 
 
 27
 for making medical or remedial care and services available to all individuals who would, if needy, be eligible for aid or assistance under any ... State [cash assistance] plan and who have insufficient (as determined in accordance with comparable standards) income and resources to meet the costs of necessary medical or remedial care and services....
 
 
 28
 79 Stat. 345. While this provision demanded that a state's Medicaid plan use comparable criteria in calculating income and resources for the categorically and the medically needy, it imposed no requirement for how such plans should determine whether a medically needy person's income and resources were insufficient to meet medical costs. Congress' concern here, like in Sec. 1902(a)(17) of the 1965 Act, as amended Sec. 1396a(a)(17), was that the medically needy should receive medical assistance if--but only if--medical expenses reduced their income to or below the eligibility level set for the state's cash assistance programs. See supra note 6.
 
 
 29
 The Omnibus Budget Reconciliation Act of 1981 (OBRA), Pub.L. No. 97-35, 95 Stat. 357, replaced what had been Sec. 1902(a)(10)(B)(i) of the 1965 Act, as amended Sec. 1396a(a)(10)(C)(i) (1976 ed.), with a much simplified version, which required only that a state's Medicaid plan for the medically needy "must include a description of ... the criteria for determining eligibility of individuals in the [medically needy] group for ... medical assistance." Sec. 2171(a)(3), 95 Stat. 807. HHS read this change as authorizing it to allow states to use income and resource criteria for the medically needy different from those applicable to the categorically needy and promulgated regulations accordingly. These regulations had nothing to do with the treatment of excess income for the medically needy or with the calculation of spend-downs. See Medicaid Program; Medicaid Eligibility and Coverage Criteria, 46 Fed.Reg. 47,976 et seq. (1981). The Secretary explained the theory of the new regulations as follows:
 
 Treatment of Income and Resources
 
 30
 1. Provisions: States are no longer required to apply a uniform methodology for treating income and resources in such matters as deemed income, interest, court-ordered support payments, and infrequent and irregular income. Rather, the State plan must specify the methodology that will be used; and that methodology must be reasonable. (See 42 CFR 435.850-435.852 and 436.850-436.852, as added by this final rule).
 
 
 31
 2. Discussion: Before the 1981 Amendments, the methodology for treatment of income and resources of the medically needy depended on the individuals' relationship to a specific cash assistance program. For example, the methodology for deeming the income of medically needy aged, blind, and disabled was taken from the SSI program. This was based on the former wording of section 1902(a)(10) of the Act that described the medically needy, in part, as individuals who "except for income and resources" would be eligible for cash assistance and for Medicaid as categorically needy. Furthermore, section 1902(a)(17)(C) of the Act required that the methodology for the treatment of income and resources be reasonable and gave the Secretary authority to prescribe standards regarding that methodology.
 
 
 32
 Section 2171 of the 1981 Amendments revised the Medicaid statute so that the direct linkage between the cash assistance programs and the medically needy is no longer explicit. (The statute no longer defines the medically needy as those who would be categorically needy "except for income and resources"). Therefore, we have concluded that the State need not adopt the methodology of a related cash assistance program in treating income and resources of the medically needy. Rather, the State may develop its own. However, section 1902(a)(17)(C) of the Act has not been amended. Consequently, these final regulations require that the State must use a methodology for the treatment of income and resources that is reasonable.
 
 
 33
 Id. at 47,980.
 
 
 34
 Congressional displeasure with the Secretary's regulations, see, e.g., 127 Cong.Rec. H7052 (daily ed. Oct. 6, 1981) (remarks of Rep. Waxman), resulted in the enactment of the "same methodology" requirement of III. See Tax Equity and Fiscal Responsibility Act of 1982 (TEFRA), Pub.L. No. 97-248, Sec. 137(a)(8), 96 Stat. 324, 378. The House Report accompanying TEFRA explained the intent behind the amendment:
 
 
 35
 The 1981 Reconciliation Act gave the States certain specified flexibility in designing their medically needy programs. They are no longer required to cover all eligibility groups, e.g., aged, blind, or disabled persons and families with dependent children. They are no longer required to provide the same benefit package to each group they choose to cover. However, the 1981 Reconciliation Act made no changes in the applicable income and resource eligibility rules.
 
 
 36
 Unfortunately, the Department, in its interim final rule of September 30, 1981, 46 Fed.Reg. 47976, assumed that the conferees had intended to give the States extensive flexibility in this area as well. This is simply incorrect. When the Statement of Managers of the conference committee report spoke of providing the States "with flexibility in establishing eligibility criteria and scope of services within the medically needy program to address the needs of different population groups more appropriately," (H.R.Rep. 97-208, p. 971), it was referring to the service package and coverage group provisions, not inviting a wholesale rewriting of current income and resource standards and methodologies. This amendment makes clear that the Department had no authority to alter the rules that applied before September 30, 1981, with respect to medically needy income levels, medically needy resource standards, and the methodology for treating medically needy income and resources. The Committee bill reaffirms the financial requirements previously in effect for the medically needy (42 C.F.R. sec. 435.800-435.845).
 
 
 37
 H.R.Rep. No. 757, Part I, 97th Cong., 2d Sess. 13 (1982).
 
 
 38
 According to the Secretary, this history makes clear that the "same methodology" language of III was intended to invalidate provisions in HHS's 1981 regulations permitting the income and resource standards in state Medicaid plans to deviate from those used in the AFDC and SSI programs in "such matters as deemed income, interest, court-ordered support payments, and infrequent and irregular income," 46 Fed.Reg. 47,980 (1981), and to require use of the same methodologies for determining these matters in all of the relevant programs. Congress, in enacting III, did not at all intend to affect HHS's regulations dealing with the treatment of excess income and the calculation of spend-downs--regulations which the Secretary had not altered following OBRA and which, in her view, the last sentence of the House Report quoted above expressly reaffirmed.[12]
 
 
 39
 The Secretary's reading is by no means implausible. In Medicaid lingo, the spend-down is not part of the "standard to be employed in determining income and resource eligibility." That standard, so far as concerns income, is whether an applicant's monthly income after deduction of various expenses (other than medical expenses) and disregards is not more than the Medicaid income level set by the state. The spend-down is not part of this standard; rather, it is the method by which a family that does not meet the standard can nonetheless bring its excess income down to the level required for inclusion in the Medicaid program. There is no dispute that before being confronted with inpatient hospital expenses the DeJesus family did not meet "the single standard to be employed in determining income ... eligibility." The question is how many months' excess income the state may require the DeJesus family to make available for payment of medical expenses before deciding that the family has reached the income level at which Medicaid coverage of further medical expenses should begin.
 
 
 40
 This is a problem as to which the Act seems to be silent. While in one sense New York's six-month spend-down requirement may be a "methodology," Congress can hardly have regarded it as such for purposes of III: since the spend-down has no counterpart in the eligibility methodologies of the cash assistance programs, it would have been tautologous for Congress to direct that states calculate spend-downs using "the same methodology" as they use in determining eligibility for those programs. Given the history showing that Congress was aiming its shafts in TEFRA at actions of the Secretary involving quite different matters, and indeed arguably was approving the Secretary's pre-OBRA regulation permitting a spend-down of up to six months (a regulation that had gone unchallenged for over 17 years), we cannot say that the Secretary's construction is untenable, although we recognize that a different one also might not be.
 
 
 41
 This conclusion is all that is required to sustain the Secretary's position that New York's six-month spend-down requirement, 18 N.Y.C.R.R. Sec. 360.5(d)(1), is authorized by HHS's longstanding regulation providing that "[a state Medicaid] agency must use a prospective period of not more than 6 months to compute income." 42 C.F.R. Sec. 435.831 (1984). As the Supreme Court said in Gray Panthers, supra, 453 U.S. at 43, 101 S.Ct. at 2640, "Perhaps appreciating the complexity of what it had wrought, Congress conferred on the Secretary exceptionally broad authority to prescribe standards for applying certain sections of the [Social Security] Act." Title XIX of the Act is shot through with references delegating the formulation of standards to the Secretary. Especially relevant for our purposes, Sec. 1396a(a)(17), in addition to authorizing the Secretary to prescribe the extent to which states must take the costs of medical care into account in determining the eligibility of the medically needy, directs the Secretary to set standards which the states must follow in determining how much income is "available" to medically needy applicants for Medicaid, Sec. 1396a(a)(17)(B). The Court recognized the import of this in Gray Panthers, supra, 453 U.S. at 44, 101 S.Ct. at 2640, declaring that
 
 
 42
 [i]n view of this explicit delegation of substantive authority, the Secretary's definition of the term "available" is "entitled to more than mere deference or weight," Batterton v. Francis, 432 U.S. , at 426 [97 S.Ct. 2399, 2406, 53 L.Ed.2d 448]. Rather, the Secretary's definition is entitled to "legislative effect" because, "[i]n a situation of this kind, Congress entrusts to the Secretary, rather than to the courts, the primary responsibility for interpreting the statutory term." Id., at 425 [97 S.Ct. at 2405]. Although we do not abdicate review in these circumstances, our task is the limited one of ensuring that the Secretary did not "excee[d] his statutory authority" and that the regulation is not arbitrary or capricious. Id., at 426 [97 S.Ct. at 2406].
 
 
 43
 Even when the Secretary has not been delegated the authority to adopt "regulations with legislative effect," as he was in Batterton v. Francis, 432 U.S. 416, 97 S.Ct. 2399, 53 L.Ed.2d 448 (1977), courts must exhibit particular deference to the Secretary's position with respect to legislation as intricate as Title XIX. See Connecticut Department of Income Maintenance v. Heckler, --- U.S. ----, 105 S.Ct. 2210, 2215, 85 L.Ed.2d 577 (1985). We should not be astute to find a provision in a state plan authorized by the Secretary's regulations requiring that six months' rather than one month's income should be taken to measure the spend-down required to enable the medically needy to receive Medicaid to be a "methodology" for determining eligibility if those versed in the terminology of the Medicaid program and responsible for its efficient administration not unreasonably say it is not.
 
 
 44
 We recognize that although the Secretary's regulation permitting up to a six-month spend-down stood unchallenged for over 17 years, there has been a spate of recent decisions disapproving it, all in line with that rendered below. See Hogan v. Heckler, 597 F.Supp. 1106 (D.Mass.1984) (invalidating six-month spend-down for SSI-related medically needy), now pending on appeal in the First Circuit; Coleman v. Miller, No. 82-C-6259 (N.D.Ill. Feb. 23, 1984) (invalidating six-month spend-down for AFDC-related medically needy); Allen v. Petit, No. 85-0025-P (D.Me. June 3, 1985) (invalidating six-month spend-down for both SSI-related and AFDC-related medically needy); Rivera v. Commissioner of Public Welfare, 395 Mass. 189, 479 N.E.2d 639 (Mass.1985) (invalidating six-month spend-down for AFDC-related medically needy); see also Brogan v. Miller, 537 F.Supp. 139 (N.D.Ill.1982) (invalidating six-month spend-down for SSI-related medically needy under Sec. 209(b)). We have carefully examined these opinions, but respectfully disagree with them for the reasons stated in this opinion. Our own cases, Calkins v. Blum, 675 F.2d 44 (2 Cir.1982); Caldwell v. Blum, 621 F.2d 491 (2 Cir.1980), cert. denied, 452 U.S. 909, 101 S.Ct. 3039, 69 L.Ed.2d 412 (1981); Greklek v. Toia, 565 F.2d 1259 (2 Cir.1977), cert. denied, 436 U.S. 962, 98 S.Ct. 3081, 57 L.Ed.2d 1128 (1978), relied on by appellee, simply require the computation of income and deductible expenses on the same basis for the categorically and the medically needy--a point conceded by the State and not at issue here.
 
 
 45
 The judgment is reversed, with instruction to grant defendants' motion for summary judgment.
 
 
 
 [1]
 We are told that the other two states in this circuit have Medicaid plans for the medically needy resembling New York's in the respects here relevant, as do some 20 other states. Questions relating to the Massachusetts statute similar to those here at issue are pending before the First Circuit in Hogan v. Heckler, argued June 4, 1985
 
 
 [2]
 All section references will be to 42 U.S.C. (1982) unless otherwise stated
 
 
 [3]
 Congress created SSI in 1972, Pub.L. No. 92-603, 86 Stat. 1465, to replace three existing categorical assistance programs--Old Age Assistance, Sec. 301 et seq. (1970 ed.); Aid to the Blind, Sec. 1201 et seq.; and Aid to the Permanently and Totally Disabled, Sec. 1351 et seq. These programs, together with AFDC, had previously been state-administered with state eligibility standards. SSI, however, was a federally administered program with a federal eligibility standard that was often much easier to meet than the prior state standard. Since eligibility for SSI confers automatic eligibility for Medicaid, Congress was concerned that the less restrictive federal standard would dramatically increase the states' shares of Medicaid costs. See Schweiker v. Gray Panthers, 453 U.S. 34, 38, 101 S.Ct. 2633, 2637, 69 L.Ed.2d 460 (1981). To meet this problem, Congress allowed states to elect to retain their more restrictive pre-1972 eligibility standards for determining whether new SSI recipients qualified for Medicaid. This election became known as the "Sec. 209(b) option." States choosing the Sec. 209(b) option must, however, allow persons who are eligible for SSI but whose income exceeds the more restrictive state Medicaid income standard to spend down their excess income by incurring medical expenses, Sec. 1396b(f). State regulations implementing this spend-down requirement, which operates in the same fashion as the spend-down requirement of Sec. 1396a(a)(17), have been challenged recently on grounds similar to those advanced here. See Brogan v. Miller, 537 F.Supp. 139 (N.D.Ill.1982)
 
 
 [4]
 In addition to being "reasonable," Medicaid income standards must be based on family size and be uniform for all persons in a covered group. 42 C.F.R. Sec. 435.811 (1984). A state's Medicaid income standard is presumptively reasonable if it at least equals the highest income standard used to determine eligibility for the state's cash assistance programs. Id. Sec. 435.812(b)
 
 
 [5]
 "Incurred medical expenses" are expenses for which a medically needy individual becomes liable, whether or not such expenses are ever actually paid. See Gadway v. Blum, 567 F.Supp. 772, 775 (N.D.N.Y.1983)
 
 
 [6]
 Congress wrote the flexible standards requirement into Sec. 1902(a)(17) of the 1965 Act, as amended Sec. 1396a(a)(17), to correct what it believed was a major failure in the existing Kerr-Mills program, Pub.L. No. 86-778, 74 Stat. 987 (1960), which Medicaid had been designed to replace. As the report of the House Ways and Means Committee accompanying the 1965 Act explained:
 The bill also contains a provision designed to correct one of the weaknesses identified in the medical assistance for the aged program. Under the current provisions of Federal law, some States have enacted programs which contain a cutoff point on income which determines the financial eligibility of the individual. Thus, an individual with an income just under the specified limit may qualify for all of the aid provided under the State plan. Individuals, however, whose income exceeds the limitation adopted by the State are found ineligible for the medical assistance provided under the State plan even though the excess of the individual's income may be small when compared with the cost of the medical care needed.
 H.R.Rep. No. 213, 89th Cong., 1st Sess. 68 (1965); see also 111 Cong.Rec. 15,876 (July 8, 1965) (remarks of Sen. McNamara).
 
 
 [7]
 The first such provision was filed with the New York Secretary of State on March 31, 1966, as subdivision (c) of 18 N.Y.C.R.R. Sec. 360.5, entitled "Determination of net available income and utilization of any excess." Subdivision (c) provided:
 The excess income shall be utilized in the following manner for the following care and services:
 (1) In hospital care cases:
 the excess income for a period of six months shall be paid to the hospital or to the local agency as a refund in accordance with a prearranged plan which is approved and accepted by the vendor of services;
 (2) Except in hospital or other medical institution care cases:
 the excess income for the month or months in which care or services are given on an unpredictable basis shall be paid to the local agency as a refund.
 
 
 [8]
 A provision allowing states to compute on a prospective basis of up to six months the income available to medically needy persons for meeting medical costs has been part of the regulations implementing Medicaid since the program's inception. The Secretary set forth the initial Medicaid regulations in a supplement to the 1966 edition of the "Handbook of Public Assistance Administration." Paragraph (A)(4) of the section entitled "Requirements for State Plan" stated that a state Medicaid plan must
 [p]rovide that only such income and resources as are actually available will be considered; that income and resources will be reasonably evaluated; and that only such income and resources will be considered as will be "in hand" within a period, preferably of not more than three months, but not in excess of six months, ahead, including the month in which medical services were rendered for which payment would be made under the plan.
 Department of Health, Education and Welfare, Handbook of Public Assistance Administration Sec. D-4220(A)(4) (Supp. D, Medical Assistance Programs June 17, 1966) (emphasis added) [hereinafter cited as "1966 Handbook"]. A later section of the 1966 Handbook, entitled "Criteria for the Administration of the Plan," explained paragraph (A)(4) in greater detail:
 Available income and resources are income and resources which are "in hand" or under the control of the individual, preferably looking to a period not in excess of three months ahead, including the month in which the medical services were rendered for which payment will be made. Income and resources are not considered as available unless they will be in hand or under control within six months ahead, including the month of service.
 Id. Sec. D-4230(4).
 When the regulations in the 1966 Handbook were codified, paragraph (A)(4) appeared verbatim at 45 C.F.R. Sec. 248.21(a)(4). See 34 Fed.Reg. 1320-21 (1969). Subsequent amendments and recodifications winnowed out the language concerning the permissible time period over which prospective income could be counted and made it a separate paragraph, see 45 C.F.R. Sec. 248.21(a)(iv), 36 Fed.Reg. 3860 (1971), and eventually deleted the recommendation that such period should be "preferably ... not more than 3 months," see 45 C.F.R. Sec. 248.3(a)(4), 39 Fed.Reg. 9517 (1974). The six-month provision first appeared in its present form in 1978 as part of paragraph (a) of 42 C.F.R. Sec. 435.831, entitled "Determining countable income," see 43 Fed.Reg. 45,215 (1978), and was later moved to its current place in that section's introductory paragraph, see 45 Fed.Reg. 24,886 (1980).
 
 
 [9]
 Plaintiff tries to minimize the weight of the Secretary's longstanding regulation by asserting that it has been invalid only since 1981 when Congress introduced one-month budgeting for AFDC in Sec. 2315(a) of the Omnibus Budget Reconciliation Act of 1981 (OBRA), Pub.L. No. 97-35, 95 Stat. 855, as amended Sec. 602(a)(13)(A). Before OBRA, the accounting period for determining AFDC eligibility and benefits had been left to the choice of the states. Although some states had chosen to calculate benefits retrospectively on the basis of the recipient's actual circumstances in a previous month, most states calculated benefits prospectively on the basis of a forecast of the recipient's circumstances for the remainder of the current month. See S.Rep. No. 97-139, 97th Cong., 1st Sess. 516-17 (1981). The Senate Budget Committee stated that the purpose of the OBRA amendment requiring one-month retrospective budgeting for AFDC was to correct the high percentage of payment errors, especially overpayments, then plaguing the program. The committee expressed its belief that monthly retrospective budgeting would eliminate the uncertainties inherent in trying to predict a recipient's future income and other circumstances. Id. at 517
 Although it is true that one month budgeting for AFDC was not mandated by Congress until 1981, it is not true that one month budgeting was unknown before then. On the contrary, many states used one month budgeting to calculate AFDC benefits, the only differences being that some states calculated retrospectively and others prospectively. Id. at 516. More important, even prior to 1981 the AFDC statute required that a state consider an applicant's income on a monthly basis in determining AFDC eligibility (as opposed to AFDC benefits). See, e.g., 42 U.S.C. Sec. 602(a)(8), (28) (1976 ed.). The Senate Budget Committee acknowledged this in its report, S.Rep. No. 97-139, supra, at 440, but stated that the problem OBRA was seeking to address lay with the calculation of benefits, not the determination of eligibility.
 Thus, throughout the period during which the Secretary's regulation permitting a six-month spend-down has been in force, eligibility for AFDC has been determined by calculating income on a monthly basis.
 
 
 [10]
 In addition to Sec. 1396a(a)(17), these decisions relied on the comparability requirement contained in Sec. 1396a(a)(10)(C)(i) prior to its amendment by Sec. 2171(a)(3) of OBRA, 95 Stat. 807 (1981). The pre-OBRA language of this section provided in pertinent part that a state Medicaid plan must make
 medical assistance available to all individuals who would, except for income and resources, be eligible for [AFDC or SSI] ..., and who have insufficient (as determined in accordance with comparable standards ) income and resources to meet the costs of necessary medical and remedial care and services....
 Sec. 1396a(a)(10)(C)(i) (1976 ed.) (emphasis added). OBRA's deletion of this language was not intended to change the requirement that categorically and medically needy persons be treated comparably. See Hodecker v. Blum, 525 F.Supp. 867, 872-73 (N.D.N.Y.1981), aff'd, 685 F.2d 424 (2 Cir.1982).
 
 
 [11]
 Things are "comparable" if they are capable of being compared. The Random House College Dictionary 273 (rev. ed. 1980). To "compare" means "to examine ... for the purpose of noting similarities and differences." Id. In contrast, things are "identical" if they are "exactly the same" or "similar or alike in every respect." Id. at 659
 
 
 [12]
 Subsequent legislative history supports the Secretary's reading of III. In the Deficit Reduction Act of 1984, Pub.L. No. 98-369, 98 Stat. 494, Congress amended III to impose a moratorium on disapproving state Medicaid plans that might be inconsistent with the "same methodology" requirement. Sec. 2373(c)(1), 98 Stat. 1112. In doing so, Congress reaffirmed that its sole intent in enacting the "same methodology" requirement had been to invalidate HHS's 1981 regulations "allowing the States to impose more restrictive [income and resource] standards and methodologies than under previous law ... for determining eligibility of the medically needy." See H.R.Rep. No. 861, 98th Cong., 2d Sess. 1366-67 (1984)