Lydia LEWIS; Andre Francis; Emiline Forbes; Clara Solano; Wilson Flores, Jr., by his next friend Wilson Flores, Sr.; Norah Murphy by her next friend Eileen Broderick; Alberto Colbourne Cattons; Yoshi Nakanishi; Letitia Morgan; Ada Williams, by her next friend Brenda Liaping; Lech Ciesluk; Carlos Gonzalez, by his next friend Rosa Reid Narvaez; Hutton Griffith; Alexander Bernshtein; Celia Teran; Patricia Arias, by her next friend Phyllis Attale; Carla Coe, on behalf of themselves and all other persons similarly situated, Plaintiffs–Appellees,

City of New York and New York City Health and Hospitals Corporation, Plaintiff–Intervenor,

v.

William GRINKER, individually and as Commissioner of the New York City Department of Social Services; Cesar Perales, individually and as Commissioner of the New York State Department of Social Services; Alice Amrheim, individually and as Commissioner of the Suffolk County Department of Social Services; Richard N. Durose, individually and as Commissioner of the Oneida County Department of Social Services, Defendants,

Louis W. Sullivan, M.D., Secretary of the United States Department of Health and Human Services, Defendant–Appellant.

No. 571, Docket 91–6176.

United States Court of Appeals, Second Circuit.

Argued Nov. 25, 1991.

Decided Jan. 31, 1992.

On Petition for Rehearing March 17, 1992.

Amended April 2, 1992.

Colin Bull, Attorney-in-charge, Lynn M. Kelly, Director of Litigation, The Legal Aid Soc., Harlem Neighborhood Office, New York City (Jane E. Booth, Director of Litigation, Richard Blum, of counsel, The Legal Aid Soc., Civil Appeals & Law Reform, Nancy Morawetz, Washington Square Legal Services, New York City for plaintiffs-appellees.

O. Peter Sherwood, Corp. Counsel of the City of New York (Pamela Seider Dolgow, Elizabeth S. Natrella, Hilary B. Klein, New York City, of counsel) for plaintiffs-intervenors-appellees.

Robert Abrams, Atty. Gen. of the State of N.Y. (Marion R. Buchbinder, Asst. Atty. Gen., New York City, of counsel) for defendant-appellee.

Charles S. Kleinberg, Asst. U.S. Atty., E.D.N.Y. (Andrew J. Maloney, U.S. Atty., Robert L. Begleiter, Warren D. Ausubel, Asst. U.S. Attys., E.D.N.Y.) for defendant-appellant.

Cary LaCheen and Herbert Semmel, New York Lawyers for the Public Interest, Inc., New York City, filed a brief amicus curiae on behalf of the American College of Obstetricians and Gynecologists, the American Medical Ass'n, the American Public Health Ass'n, the Greater New York March of Dimes Birth Defect Foundation, the New York State Perinatal Ass'n, the New York State Public Health Ass'n, and the Public Health Ass'n of New York City.

Before: OAKES, Chief Judge, and FEINBERG and WALKER, Circuit Judges.

## AMENDED OPINION

WALKER, Circuit Judge:

Eleven years ago, plaintiffs, a group of aliens living in New York, initiated this

lawsuit on behalf of themselves and all similarly situated persons seeking to enjoin the Secretary of Health and Human Services (the Secretary) from denying them Medicaid coverage based on their alienage status. Since the suit was filed, the Medicaid statute has been amended in relevant ways five times, the district court has issued three different injunctions and four separate opinions, the Secretary has announced a host of new regulations, and yet questions persist about the precise contours of aliens' entitlement to Medicaid coverage.

■ In this appeal, we are called upon to decide only a single narrow question. Did Congress, in enacting the Omnibus Budget Reconciliation Act of 1986, P.L. 99–509, 100 Stat. 1874 (OBRA '86), intend to prevent otherwise eligible pregnant women who are residing in this country without the approval of the Immigration and Naturalization Service (INS) from receiving Medicaid sponsored prenatal care, even though their children, if born in the United States, will become United States citizens? After reviewing the language of the statute, the legislative and statutory background, and the relevant administrative interpretations, we conclude that Congress did not intend to bar these women from receiving Medicaid sponsored prenatal care. Accordingly, we affirm the permanent injunction issued by the district court.

## I

In order to understand the complex question presented by this appeal, it is necessary to explore in some depth the structure of the Medicaid statute, the development of Medicaid coverage for prenatal care, and the origins of the alienage restriction at issue here.

### A

■ Originally enacted in 1965, Medicaid is a "cooperative federal/state cost-sharing program designed to enable participating states to furnish medical assistance to persons whose income and resources are insufficient to meet the costs of necessary medical care and services." *DeJesus v. Perales,*

770 F.2d 316, 318 (2d. Cir.1985), *cert. denied,* 478 U.S. 1007, 106 S.Ct. 3301, 92 L.Ed.2d 715 (1986). In order to provide Medicaid coverage to its citizens, a state must first adopt a state Medicaid plan and submit the plan for approval by the Secretary. Once the state plan is approved, the federal government will partially reimburse the state for expenditures made pursuant to the state plan.

The Act authorizes state plans to extend coverage to two basic categories of individuals, the categorically needy and the medically needy. As the district court explained in *Lewis v. Gross,* 663 F.Supp. 1164, 1174 (E.D.N.Y.1986) (*Lewis I*), "[r]oughly speaking, the categorically needy are those who earn no more than that necessary to cover the necessities of life; the medically needy differ in that it is only the expense of necessary medical care that strains their ability to pay for basic necessities." The Medicaid statute provides a complex set of standards for the way that participating states must provide coverage to categorically and medically needy individuals.

First, 42 U.S.C. § 1396a(a)(10)(A)(i) requires participating states to provide Medicaid to a sub-group of the categorically needy, the "mandatory categorically needy." This group is mostly made up of those already receiving some other government benefit, such as aid to families with dependent children (AFDC), or supplemental security income (SSI). Women who meet the statutory definition of "qualified pregnant women" are also considered mandatory categorically needy. § 1396a(a)(10)(A)(i)(III).

Second, § 1396d(a)(i) defines a group of categorically needy individuals to whom the state may, at the state's option, choose to provide Medicaid coverage. "Generally speaking ... the optionally needy subgroup includes minors, the elderly, the blind, the disabled, pregnant women, [and] the spouses of SSI recipients or AFDC-related caretaker relatives, if they are 'needy' according to the income and resource requirements of the AFDC and SSI

cash benefit programs." *Lewis I*, 663 F.Supp. at 1177.

Third, the medically needy category includes the same groups of individuals that the states may cover as optional categorically needy, but applies less stringent financial and resource requirements. While medically needy coverage is generally optional with the states, once a state chooses to provide coverage to some medically needy individuals, it must provide, *inter alia*, prenatal and delivery services to medically needy pregnant women. § 1396a(a)(10)(C)(ii) & (iii).

■ Under current law, pregnant women seeking prenatal care may be eligible for Medicaid under any of the three categories, depending on their financial status. However, this was not always the case. Before 1981, pregnant women were not even identified as a special eligibility group under the Medicaid statute. Instead, states simply had the option to extend prenatal care directly to the fetus, under the assumption that fetuses were optional categorically needy as "persons under the age of 21." In order to assess properly Congressional intent in enacting the immigration restriction of OBRA '86, it is first necessary to examine more carefully this shift from a fetal centered to a maternal centered approach to prenatal care.

### B

#### 1. Pre–1975.

Before the Medicaid statute was enacted in 1965, federal sponsorship of prenatal care came largely under AFDC. AFDC required participating states to provide benefits to needy, dependent children. Federal law defined a "dependent child" as:

a needy child (1) who has been deprived of parental support or care by reason of death, continued absence from the home, or physical or mental incapacity of a parent, and who is living with [relatives] ..., in a place of residence maintained by one or more such relatives as his or their own home, and (2) who is (A) under the age of eighteen or (B) under the age 21 and ... a student.

42 U.S.C. § 606(a) (1976).

Beginning in the 1940's, the Department of Health, Education, and Welfare (HEW) reimbursed those states that chose to provide AFDC benefits to fetuses as dependent children.

Until 1975 it was unclear whether federal reimbursement for state AFDC expenditures to fetuses was mandatory because fetuses were dependent children within the definition of § 606(a) or simply optional with the Secretary pursuant to his "general authority to make rules for the efficient administration of the Act." *Burns v. Alcala*, 420 U.S. 575, 584, 95 S.Ct. 1180, 1186, 43 L.Ed.2d 469 (1975).

In *Burns*, the Supreme Court ruled that fetuses were not dependent children within the meaning of the AFDC statute and thus the states were not required to provide AFDC to pregnant women. The court viewed the question of whether the states retained the option of treating fetuses as dependent children as not properly presented in the case but suggested that HEW could authorize optional coverage of pregnant women under AFDC via its general regulatory powers.

#### 2. 1975–1981.

Between 1975 and 1981, HEW continued to allow states the option of treating fetuses as dependent children in order to provide AFDC to pregnant women. However, the Secretary never adopted this casual practice in formal regulations. The Secretary acknowledges that during this time period he allowed the states to provide Medicaid on a similar, optional basis, under the theory that fetuses were optional categorically needy as "persons under the age of 21." While this informal practice was never adopted by regulation, until 1985 the Medicaid program manual that the Secretary sent to the states listed fetuses as a group the states could cover as optional categorically needy.

### 3. The Omnibus Budget Reconciliation Act of 1981.

In the Omnibus Budget Reconciliation Act of 1981, P.L. 97–35, 95 Stat. 853 (1981) [OBRA '81], Congress began the slow shift from fetal centered to maternal centered provision of prenatal care. OBRA '81 amended the AFDC statute in three ways.

First, OBRA '81 addressed the question left open by *Burns*, declaring that the states no longer had the option to give AFDC directly to meet the needs of the unborn. OBRA '81, § 2312(b), 95 Stat. 853. In place of direct AFDC coverage for the fetus, Congress broadened coverage to include

> at the option of the state, a pregnant woman but only if it has been medically verified that the child is expected to be born in the month such payments are made or within the three month period following such month of payment, and who, if such child had been born and was living with her in the month of payment, would be eligible for [AFDC].

OBRA '81, § 2312(a), 95 Stat. 853.

In other words, women in the third trimester of pregnancy could apply for AFDC as if their child had been born. Finally, the act gave the states the option to "deem" a pregnant woman an AFDC recipient for Medicaid purposes (and thus mandatorily eligible for Medicaid) if the woman would be eligible for AFDC if the child had been born and was living with her. OBRA '81, § 2312(b), 95 Stat. 853.

OBRA '81 also amended the Medicaid statute in two ways. First, echoing the aforementioned addition to the AFDC statute, OBRA '81 authorized the states to "deem" pregnant women to be AFDC recipients in order to provide these women with prenatal care under Medicaid. Second, OBRA '81 provided that states with medically needy programs were required to provide prenatal care to medically needy pregnant women.

Thus, after OBRA '81, states no longer had the option to provide AFDC directly to fetuses. Nonetheless, OBRA '81 greatly expanded access to prenatal care. Under the act, a mother was eligible for AFDC in the last three months of pregnancy if she would be eligible based on the constructive birth of the fetus. Further, the states had the option to provide Medicaid coverage for prenatal care to the mother either as mandatory categorically needy or as medically needy. Finally, since the act did not address the question, the Secretary continued to allow the states the option to provide Medicaid coverage directly to the fetus as a person under age 21.

### 4. The Deficit Reduction Act of 1984.

In the Deficit Reduction Act of 1984, P.L. 98–369, 98 Stat. 494 (1984) [DRA '84], Congress for the first time established mandatory Medicaid eligibility for pregnant women. The DRA made mandatory categorically needy any "qualified pregnant woman or child," DRA '84 § 2361(b), 98 Stat. 1104, defined as:

> (1) a pregnant woman who—
> (A) would be eligible for [AFDC] ... if her child had been born and was living with her in the month such aid would be paid, and such pregnancy has been medically verified; or
> (B) is a member of a family which would be eligible for [AFDC] ...; and
> (2) a child who is under 5 years of age ... and who meets the income and resources requirements of the State [AFDC] plan.

DRA '84, § 2361(b), 98 Stat. 1104.

The qualified pregnant woman provision greatly expanded access to prenatal care. Where OBRA '81 merely gave states the option to employ the constructive birth mechanism to deem pregnant women AFDC recipients for Medicaid purposes, DRA '84 required the states to do so. Further, DRA '84 provided for automatic eligibility for the newborn:

> [a] child born to a woman eligible for, and receiving medical assistance under a state plan on the date of the child's birth shall be deemed to have applied for medical assistance and to have been found eligible for such assistance under such plan on the date of such birth and to remain eligible for such assistance for a

period of one year so long as the child is a member of the women's household and the woman remains eligible for such assistance.

DRA '84, § 2362(a), 98 Stat. 1104.

This provision insured that the Medicaid coverage would follow the fetus after birth. However, significant limits remained. Because qualified pregnant woman status turned on AFDC eligibility, the Medicaid applicant had to satisfy the categorical requirements of AFDC. For example, if the pregnant woman were living with the child's father, she would not be a qualified pregnant woman under DRA '84 since the imputed child would not be a dependent child under AFDC, which requires that the child be "deprived of parental support or care by reason of death, continued absence from the home, or physical or mental incapacity of a parent." 42 U.S.C. § 606(a).

### 5. The Consolidated Omnibus Budget Reconciliation Act of 1985.

In the Consolidated Omnibus Budget Reconciliation Act, P.L. 99-272, 100 Stat. 201 [COBRA '85], Congress broke the link between AFDC eligibility and Medicaid eligibility for pregnant women. The statute added a subsection (C) to the definition of a qualified pregnant woman to include a pregnant woman who "meets the income and resource requirements of a [State AFDC plan]." COBRA '85, § 9501, 100 Stat. 201. This separation made it significantly easier for pregnant women to qualify for prenatal care. Where before they had to demonstrate they fit into one of the particular categories of eligibility for AFDC, which took into account such factors as family structure, after CO-BRA '85 all the prospective qualified pregnant woman had to demonstrate was that she was sufficiently poor. Further, the Secretary interpreted the imputed birth provision to apply to all three sections of the definition of qualified pregnant women. 52 Fed.Reg. 43,065 (1987). Thus, the fetus' interest could be considered in determining whether the woman was financially needy.

Between 1981, when Congress eliminated direct AFDC eligibility for fetuses, and 1984, when Congress made Medicaid coverage for AFDC eligible pregnant women mandatory, the Secretary apparently also allowed states to provide Medicaid coverage in the name of the fetus rather than the pregnant woman. In February 1985, in Program Memorandum # 85-3, for the first time the Secretary did not list fetuses as one of the categories of people under age 21 to whom the states could, at their option, provide Medicaid. Whether this omission was inadvertent or intentional was not made clear until December 6, 1985, when, in response to an inquiry from a regional Medicaid administrator, the Acting Director of the Bureau of Eligibility, Reimbursement and Coverage sent a memo to the regional administrator informing him that HHS now considered Congress' intent to be that the exclusive source of Medicaid coverage for prenatal care would be through the pregnant mother. This unpublished decision by the Secretary completed the shift from fetal centered to maternal centered prenatal care.

### C

When Congress passed the Medicaid statute in 1965, it did not address the eligibility of aliens. Until 1973, the Secretary routinely approved State plans that provided Medicaid benefits to aliens. *Lewis I* at 1181-82. Indeed, in 1972 the Secretary proposed regulations that would have prevented the states from discriminating against aliens in providing Medicaid. *See* 37 Fed.Reg. 1,977 (1972). Before these regulations became final, however, Congress amended the Social Security Act to create the supplemental security income (SSI) program. SSI expressly excluded aliens from coverage. *See* Social Security Act Amendments of 1972, § 1614, Pub.L. No. 92-603, Title III, § 301, 86 Stat. 1329, 1471 (1972). Despite the fact that Congress simultaneously amended the Medicaid statute and did not create an alien exclusion there, the Secretary concluded that Congress must also have intended to preclude aliens from receiving Medicaid. Accordingly, the Secretary promulgated an

alienage restriction on access to Medicaid in 38 Fed.Reg. 30,259 (1973), codified at 45 C.F.R. 248.50. This rule provided that:

> [a] state plan under title XIX of the Social Security Act [Medicaid] shall include an otherwise eligible individual who is a resident of the United States but only if he is either (a) a citizen or (b) an alien lawfully admitted for permanent residence or otherwise permanently residing in the United States under color of law.

This pattern of Congressional enactment of an alienage restriction in some other benefit statute coupled with simultaneous amendments to Medicaid not providing for an alienage restriction continued when, in OBRA '81, Congress amended AFDC to include an alienage restriction, but did not place one on Medicaid. *Lewis I* at 1182.

Sometime before 1986, the Medicaid alienage exclusion imposed by the Secretary in 1973 was replaced with the following provision that does not appear to mandate excluding aliens:

> The agency must provide Medicaid to otherwise eligible residents of the United States who are—
>
> (a) Citizens; or
>
> (b) Aliens lawfully admitted for permanent residence or permanently residing in the United States under color of law ..."

42 C.F.R. 435.402.

The regulation did not state whether the federal government would reimburse a State that, although not mandated, nevertheless chose to provide benefits to aliens that were not permanently residing in the United States under color of law [PRUCOL] as well. Nonetheless, the Secretary apparently continued to require that state Medicaid plans exclude aliens.

The Secretary has never published regulations dealing with the alienage status of the fetus. The only expression of policy on this point appears in the HCFA Regional Office Manual-7, Chapter 5 (May 10, 1979), which, in response to an inquiry from Region II on the Medicaid eligibility of unborn children of non-citizen mothers, states, "[u]nborn children carry the citizenship status of the mother ... It cannot be assumed that a child will be born in the United States, and therefore, a child cannot gain U.S. citizenship through that means until delivery." This 1979 office manual provision predates the creation of the imputed birth concept in OBRA '81, which the Secretary interprets as requiring the states to treat the unborn child "as if the child were born and living with the mother." 52 Fed.Reg. 43,068 (1987). Since the Secretary has not revisited the question, it is unclear whether the 1979 policy survived this change in the law.

In 1986, five years after this litigation began, Congress enacted the Medicaid alienage restriction that the Secretary here contends requires denying Medicaid coverage for prenatal care to non-PRUCOL pregnant alien women, even though their children will, in all likelihood, be born in this country and thus become American citizens. *See* 42 U.S.C.A. § 1396a (West Supp.1991).

II

This litigation commenced in 1981, when plaintiffs Lewis et. al. sued to enjoin the Secretary from enforcing the regulations imposing a general alienage restriction on Medicaid eligibility. Plaintiffs argued that (1) the Medicaid statute did not explicitly authorize such a regulation; (2) that the regulations violated equal protection and due process; (3) that the Secretary's definition of PRUCOL was impermissibly narrow; and (4) that the regulations did not apply to benefits directed to unborn children. After years of pre-trial skirmishing over the dimensions of the plaintiff class, the litigation reached its apparent culmination in 1986. On July 14, 1986, the district court ruled that the Secretary's policy of denying Medicaid benefits to all aliens who are not admitted for permanent residence or permanently residing under color of law (PRUCOL) was not authorized by the statute. *Lewis v. Gross*, 663 F.Supp. 1164 (E.D.N.Y.1986) (*Lewis I*). The court pointed out that nothing in the Medicaid statute expressly authorized an alienage restriction, while similar benefit programs, like AFDC and SSI, contained explicit alienage

restrictions in their authorizing statutes. *Id.* at 1182. The court reasoned that Congress obviously knew how to create an alienage restriction, and had simply declined to do so for Medicaid. *Id.* at 1183. The court rejected the Secretary's arguments that Congress had acquiesced in the Secretary's longstanding policy, *id.* at 1179–80, and that the Medicaid statute incorporated by reference the alienage restrictions of the AFDC and Social Security Acts. *Id.* at 1180. Instead, the court noted that while the AFDC and SSI alienage restrictions could be imported into the mandatory categorically needy group, since Medicaid eligibility under this rubric turned on the applicant already receiving AFDC or SSI, neither the medically needy group nor the optional categorically needy group explicitly made reference to AFDC or SSI. Accordingly, the alienage restrictions in AFDC and SSI could not be incorporated into all the provisions of the Medicaid Act. *Id.* Since the court decided the case on statutory grounds, it did not reach any of plaintiffs' other claims. In particular, the court did not address the application of alienage restrictions to prenatal care.

Congress responded swiftly to the district court's opinion. On October 21, 1986, Congress passed the Omnibus Budget Reconciliation Act of 1986, Pub.L. 99–509, 100 Stat. 2050 (OBRA '86). OBRA '86 added to § 1396a of the Medicaid act the provision that:

> [n]otwithstanding paragraph 10(B) or any other provision of this subsection, a State plan shall provide medical assistance with respect to an alien who is not lawfully admitted for permanent residence or otherwise permanently residing in the United States under color of law only in accordance with section 1396b(v) of this title.

42 U.S.C.A. § 1396a (1991 Supp.)

> § 1396b(v) provides that:
> (2) Payments shall be made under this section for care and services that are furnished to an alien ... only if—
> (A) such care and services are necessary for the treatment of an emergency medical condition of the alien, and

> (B) such alien otherwise meets the eligibility requirements for medical assistance under the State plan ...
> (3) For purposes of this subsection, the term "emergency medical condition" means a medical condition (including emergency labor and delivery) manifesting itself by acute symptoms of sufficient severity

.    .    .    .    .

42 U.S.C.A. § 1396b(v) (1991 Supp.)

The legislative history of OBRA '86 explains that these amendments were designed specifically to address the district court's decision in *Lewis I*. The vice of *Lewis I* was that "the result of th[e] decision is that otherwise qualified aliens who are eligible for Medicaid as non-cash beneficiaries—i.e., medically needy or optional categorically needy individuals—are entitled to Medicaid coverage." H.Rep. No. 99–727, 99th Cong., 2d Sess. 111 (1985), *reprinted in,* 1986 U.S. Code Cong. & Admin.News 3607, 3701 [hereinafter 1986 House Report]. Accordingly, OBRA '86 was enacted in order to insure that "nothing in the Medicaid title should be construed to require a State plan to offer coverage to aliens who are not lawfully admitted for permanent residence or otherwise permanently residing in the U.S. under color of law." *Id.*

Since OBRA '86 was passed after the district court's decision in *Lewis I* but before the entry of final judgment, the district court invited the parties to brief the issue of what effect the statute had on the ruling in *Lewis I*. The Secretary then moved to vacate *Lewis I*. On April 23, 1987, the district court rejected the Secretary's request to vacate the prior opinion. While agreeing that prospective injunctive relief was no longer appropriate, the court concluded that OBRA '86 was not intended to have retroactive effect, so the plaintiffs were entitled to relief for the period dating prior to January 1, 1987, when OBRA '86 went into effect. *See Lewis v. Grinker,* 660 F.Supp. 169 (E.D.N.Y.1987) (*Lewis II*).

While the Secretary's motion for reconsideration of *Lewis I* was pending, the Secretary submitted to the court an advance

copy of an internal directive which, *inter alia,* provided that pregnant non-PRUCOL women would not be eligible for Medicaid sponsored prenatal care. On January 20, 1987, the plaintiffs moved for a preliminary injunction to prevent this policy from going into effect. The plaintiffs argued both that the policy was not authorized by OBRA '86 and that, if it was, the policy was unconstitutional. On March 5, 1987, the district court issued the preliminary injunction. *Lewis v. Grinker,* CV–79–1740, 1987 WL 8412 (E.D.N.Y. March 5, 1987) (*Lewis III*). The court reasoned that fetuses were eligible for Medicaid in their own name as optional categorically needy individuals under the age of 21, that fetuses were not aliens, and thus that the alienage restriction of OBRA '86 did not apply. *Lewis III* at 27–28. The court did not reach the constitutional question. The Secretary chose not to appeal from the court's decision in *Lewis III,* despite the fact that the court's determination that fetuses were eligible in their own name conflicted with the agency's policy announced in the December 6, 1985 internal memorandum.

In November of 1989, the plaintiffs returned to the district court, this time seeking to turn the preliminary injunction of *Lewis III* into a permanent injunction. *Lewis v. Grinker,* CV–79–1740, 1991 WL 337553 (E.D.N.Y. March 14, 1991) (*Lewis IV*). In *Lewis IV,* the district court agreed with the Secretary that fetuses were not eligible for Medicaid in their own name as "individuals under age 21." *Id.* at 14. However, the court did not deny the request for a permanent injunction. Instead, the court determined that OBRA '86 did not prevent non-PRUCOL aliens from being deemed qualified pregnant women for the purpose of receiving prenatal care. The district court explained that the qualified pregnant woman rule requires that the fetus be deemed born, and the fetus, if born would be a citizen. *Lewis IV* at 17. Further, though provided through the mother, prenatal care is designed to benefit the fetus. *Id.* at 19. Since the fetus has imputed citizenship, the district court concluded that the alienage restriction did not apply to prenatal care. Finally, though not

explicitly deciding the constitutional question, the district court observed that "the denial of prenatal care in the circumstances here presented may well violate the equal protection clause." *Id.* at 27. Accordingly, the district court granted the permanent injunction. *Id.* at 30. At long last, a decade after the complaint was filed, this appeal followed.

### III

The Secretary makes little effort to justify denying, pursuant to an alien restriction, care that will, in all likelihood, benefit future citizens. The Secretary does not dispute that prenatal care is cost effective or that a significant number of citizen children will suffer birth defects as a direct result of the denial of prenatal care to their non-PRUCOL mothers. The Secretary suggests only that denying Medicaid coverage to poor, pregnant, non-PRUCOL women will somehow inspire them to return to their native land for prenatal care. The Secretary's ambivalence about this highly speculative justification is suggested by the fact that for the duration of this lawsuit, the Secretary has continued to provide non-PRUCOL women with prenatal care and neither appealed the preliminary injunction issued in *Lewis III* nor requested a stay pending appeal of the permanent injunction issued in *Lewis IV.* As judges, however, our task is not to assess whether the Secretary's decision to bar non-PRUCOL women from receiving prenatal care is a wise one. Instead, we must determine whether Congress intended that result or some other, and, if it did, whether Congress' choice was constitutional.

The Secretary relies principally on the plain language of OBRA '86 that "[n]otwithstanding paragraph 10(B) or any other provision of this subsection, a State plan shall provide medical assistance with respect to an alien who is not lawfully admitted for permanent residence or otherwise permanently residing under color of law only in accordance with section 1396b(v) of this title." Section 1396b(v) limits coverage to emergency situations, including emergency labor and delivery. Plaintiffs

concede that prenatal care does not come within the definition of an emergency condition in § 1396b(v). Clearly, the Secretary's position is consistent with the plain language of the statute.

In the usual case, where the language of the statute is clear, that is the end of the analysis. *Connecticut v. U.S. Environmental Protection Agency*, 656 F.2d 902, 909 (2d. Cir.1981). But, we can never forget that what we are searching for is Congressional intent. *Farley v. Metro–North Commuter R.R.*, 865 F.2d 33, 33 (2d Cir. 1989) ("a judge must ascertain what Congress intended the law to be."). While the language employed by Congress is usually a sure guide to Congress' intent, it is not an infallible proxy. *See Bob Jones University v. United States*, 461 U.S. 574, 586, 103 S.Ct. 2017, 2025, 76 L.Ed.2d 157 (1983) ("It is a well-established canon of statutory construction that a court should go beyond the literal language of a statute if reliance on that language would defeat the plain purpose of the statute."). We must bear in mind Learned Hand's admonition that "it is one of the surest indexes of a mature and developed jurisprudence not to make a fortress out of the dictionary; but to remember that statutes always have some purpose or object to accomplish, whose sympathetic and imaginative discovery is the surest guide to their meaning." *Cabell v. Markham*, 148 F.2d 737, 739 (2d. Cir.), *aff'd*, 326 U.S. 404, 66 S.Ct. 193, 90 L.Ed. 165 (1945).

■ This advice is particularly pertinent when construing a recent amendment to a complex statute that produces an unexpected result and when there is strong reason to doubt that Congress intended that result. *See DeJesus v. Perales*, 770 F.2d 316, 321 (2d. Cir.1985), *cert. denied*, 478 U.S. 1007, 106 S.Ct. 3301, 92 L.Ed.2d 715 (1986); *see also Farley v. Metro North Commuter R.R.*, 690 F.Supp. 268, 270 (S.D.N.Y.1988) ("The need to examine a statute's purpose is particularly strong when the situation facing the court was unforseen by the legislature at the time when the statute was passed."), *aff'd*, 865

F.2d 33 (2d Cir.1989); 2A Singer, Statutory Construction § 45.09.

For example, in *Rose v. Rose*, 481 U.S. 619, 107 S.Ct. 2029, 95 L.Ed.2d 599 (1987), the Supreme Court ruled that a broad statutory bar on attaching veterans' benefits did not prevent states from seizing these benefits in order to enforce child support obligations. The statute, 38 U.S.C. § 3101(a), provided that "[p]ayment of benefits ... under any law administered by the Veteran's Administration ... made to, or on account of, a beneficiary ... shall not be liable to attachment, levy, or seizure by or under any legal or equitable process whatever, either before or after receipt by the beneficiary." Despite the breadth of this prohibition, the Court found that "[r]ecognizing an exception to the application of § 3101(a)'s prohibition against attachment, levy, or seizure would further, not undermine, the federal purpose in providing these benefits," 481 U.S. at 634, 107 S.Ct. at 2038, since the statute intended that veterans' benefits support "not only the veteran, but the veteran's family as well." *Id.* Accordingly, the Court concluded that "§ 3101(a) does not extend to protect a veteran's disability benefits from seizure where the veteran invokes that provision to avoid an otherwise valid order of child support." *Id.* Thus, where a broad statutory prohibition leads to unforseen results contrary to the purpose of the prohibition, the courts may legitimately recognize an exception to the prohibition in order to further Congress' purpose.

Here, although we agree with the Secretary that the plain language of the statute appears to require denying prenatal care to non-PRUCOL women, for the reasons discussed below we are convinced that Congress did not realize this result would follow from the blanket alienage restriction of OBRA '86 and that had Congress foreseen this problem, it would not have enacted the statute as written. Accordingly, as in *Rose*, recognizing an exception to the alienage restriction of OBRA '86 for non-PRUCOL pregnant women would further, not undermine, Congressional purpose.

## A

There are several reasons to believe that Congress did not realize that OBRA '86 would result in denying non-PRUCOL women access to Medicaid sponsored prenatal care. First, the Medicaid Act is a statute of "unparalleled complexity," *DeJesus*, 770 F.2d at 321, among the "most intricate ever drafted by Congress" *Schweiker v. Gray Panthers*, 453 U.S. 34, 43, 101 S.Ct. 2633, 2640, 69 L.Ed.2d 460 (1981). Its provisions are " 'almost unintelligible to the uninitiated.' " *Id.* (quoting *Friedman v. Berger*, 547 F.2d 724, 727 n. 7 (2d. Cir.1976) *cert. denied*, 430 U.S. 984, 97 S.Ct. 1681, 52 L.Ed.2d 378 (1977)). In interpreting the Act, we must resist "the temptation of allowing a literal reading of a relatively recent amendment to set at naught the experience of administrators acquired over a score of years." *DeJesus*, 770 F.2d at 321. Thus, we are always mindful of the possibility that Congress may have failed to perceive a particular consequence of a blanket change in this complex statutory scheme. It simply is unwise to blindly assume that Congress will always fully anticipate every implication of the plain meaning of a particular amendment to such a convoluted statute. This seems particularly true when the Congressional enactment comes in the form of a section of an end-of-session, omnibus budget reconciliation bill.

Within this contorted scheme, few areas are more complex than the coverage of prenatal care. As described above, in the years preceding OBRA '86, Congress had radically expanded the basis for determining eligibility for prenatal care and had gradually moved from a fetal centered to a maternal centered approach. In doing so, Congress frequently tripped over the statute's complexities. For example, the Secretary has concluded that two sections of the definition of qualified pregnant women are redundant. *See* 50 Fed.Reg. 48,102, 48,103 (1985) ("In our view, the language of section 1905(n)(1)(B) of the Act, defining a qualified pregnant woman, appears to identify a subset of the group already defined in section 1905(n)(1)(A)"); 52 Fed.Reg. 43,-063, 43,068 (1987) ("the distinction between the two requirements is not clear"). Further, when Congress amended OBRA '81 to require states with medically needy programs to provide coverage to medically needy pregnant women, Congress forgot to add pregnant women to § 1396d(a), which lists the categories of individuals that the states can choose to cover as optional categorically needy or medically needy. This lacuna was corrected in the Tax Equity and Fiscal Responsibility Act of 1982, P.L. 97-248, § 137(a)(18), 96 Stat. 380. Both the complexity of the area and the history of mistakes as Congress strove to expand prenatal benefits to future citizens raise doubts about whether Congress realized the implications of OBRA '86.

Further, the legislative history provides direct evidence that Congress neglected to consider the implications of OBRA '86 for qualified pregnant women. The house report makes clear that the alienage restriction of OBRA '86 was in direct response to the district court's decision in *Lewis I*. However, that decision dealt with the general alienage restriction contained in the Secretary's regulations and did not consider the narrow issue of whether that alienage restriction applied to prenatal care.

In *Lewis I* the Secretary argued that the general alienage restriction was authorized by the statute since the statute incorporated by reference the eligibility criteria of other statutes, like SSI and AFDC, that contained explicit alienage restrictions. The district court acknowledged that "[s]uch incorporation is clear with respect to the mandatory categorically needy, who are those actually receiving AFDC and SSI benefits." *Lewis I*, 663 F.Supp. at 1178. However, the court observed that AFDC or SSI eligibility was not a prerequisite for being classified as optional categorically needy or medically needy. Accordingly, it rejected the Secretary's incorporation argument. Congress, in enacting OBRA '86, similarly characterized the group of applicants not currently under an alienage restriction imported from AFDC or SSI as "otherwise qualified aliens who are eligible for Medicaid as non-cash beneficiaries—i.e., medically needy or optional categorically

needy individuals." H.Rep. at 111, *reprinted in* 1986 U.S.C.C.A.N. at 3701. The Secretary himself, in 1990, also agreed that the effect of *Lewis I* was limited to making eligible medically needy and optional categorically needy individuals. 55 Fed.Reg. 36,814 (1990).

Neither Congress nor the Secretary appeared to realize that COBRA '85 created a class of individuals who were mandatory categorically needy but were not eligible for AFDC or SSI. That is, COBRA '85 added subsection (C) to § 1396d(n)(1), amending the definition of qualified pregnant women to include women who "meet[ ] the income and resources requirements of a State plan under [AFDC]." The Secretary has construed subsection (C) to mean that "[i]n determining whether a woman would be eligible under the provisions of section [1396d](n)(1)(C) of the Act, State Medicaid agencies must apply *only* the financial eligibility criteria of the State's approved AFDC plan." 52 Fed. Reg. 43,065 (1987) (emphasis added). In other words, women eligible under subsection (C) need not satisfy other criteria of AFDC, like citizenship. Thus, non-PRUCOL pregnant women who satisfied the financial eligibility criteria of AFDC were, after the district court's decision in *Lewis I,* mandatory categorically needy persons eligible for Medicaid. Neither Congress nor the Secretary recognized this, since both thought the group made eligible by *Lewis I* included only medically needy and optional categorically needy individuals. Thus, there is direct evidence that Congress did not consider qualified pregnant women when it passed the alienage restriction in OBRA '86.

Even if Congress had been considering the plight of non-PRUCOL qualified pregnant women and their fetuses when it enacted the alienage restriction of OBRA '86, it is not clear that Congress would have realized that OBRA '86 would cut off all Medicaid sponsored prenatal care to non-PRUCOL pregnant aliens. In order to foresee this result, Congress would have had to have been aware of one of two unpublished positions taken by HHS: (1) that states no longer had the option to provide coverage directly to the fetus (contained only in an unpublished December 5, 1985 letter to a regional administrator) or (2) that the fetus inherited the immigration status of the mother (contained only in an unpublished May 10, 1979 response to an inquiry from a regional administrator). Otherwise, Congress would have assumed that even after OBRA '86 the states would be free to extend prenatal care directly to the fetus as a person under 21. There is every reason to believe that Congress was not aware of either of these positions. "We have long since learned not to put too much stock in Social Security office manuals," *N.Y.S. Dept. of Soc. Services v. Bowen,* 846 F.2d 129, 133 (2d. Cir.1988) which, after all, have "no legal force." *Schweiker v. Hansen,* 450 U.S. 785, 789, 101 S.Ct. 1468, 1471, 67 L.Ed.2d 685 (1981) (per curiam). Thus, even if Congress had focused on the question, it is unlikely that Congress would have perceived the effect that the Secretary asserts was plainly intended.

Further, construing OBRA '86 to terminate prenatal care for non-PRUCOL pregnant women creates an anomaly in another section of the statute. Newborn children are automatically eligible for Medicaid in their own name if their mothers were eligible for Medicaid sponsored prenatal care. 42 C.F.R. § 435.117. If non-PRUCOL pregnant women are ineligible for Medicaid, then the child of an alien would not automatically be eligible for Medicaid while the child of a citizen would. Yet both children are United States citizens. Such discrimination against the citizen child on the basis of the alien status of the parent would raise serious equal protection questions.

This anomaly is not eliminated by the fact that the newborn child of the alien would be able to apply for Medicaid in her own name, or that if the infant were determined to be eligible, the Medicaid award would be retroactive to before the date of her application. Significant disparities in application procedure and coverage remain. Under 42 C.F.R. § 435.914, retroactivity extends back only three months prior to the

date of the application. Thus, if the non-PRUCOL alien's newborn applies more than 3 months after birth, she would not be eligible retroactively for full post birth medical expenses, while the child of the citizen would be automatically eligible for all expenses for one year, without any need to apply. This potential constitutional infirmity raises further doubt as to Congress' intent to exclude non-PRUCOL aliens from prenatal care. It also highlights the irrationality, which Congress doubtless would have perceived if it had focused on the issue, of treating the fetus of a non-PRUCOL women as an alien when, upon birth, the child will become eligible for the full panoply of protections afforded citizens.

The Secretary offers only two arguments to support his claim that Congress considered the impact on prenatal care when it passed the alienage restriction of OBRA '86. First, OBRA '86 adds section 1396b(v), which extends emergency care to non-PRUCOL aliens, and defines emergency care to include emergency labor and delivery. From this, the Secretary argues that Congress must have intended that labor and delivery were the only sort of prenatal care that Congress wished to extend to aliens. Otherwise, including labor and delivery within the definition of emergency care would be redundant. There are two problems with this argument. First, emergency labor services differ from prenatal care in one crucial respect. Emergency labor services inure, at least in part, to the benefit of the mother. In contrast, prenatal care principally benefits the fetus. Thus, it is hardly redundant to provide both emergency labor and delivery services to the mother and prenatal care to the fetus. Moreover, we do not agree that any redundancy indicates a Congressional intent to limit prenatal care, since the existence of redundancies in coverage is consistent with Congressional desire to insure that children do not slip through the cracks of prenatal care. *See* H.Rep. at 100–01, *reprinted in* 1986 U.S.C.C.A.N. at 3690–91 (expanding definition of medically needy pregnant woman so as to prevent interruptions in coverage).

The Secretary also points out that in the Immigration Reform and Control Act of 1986, Pub.L. No. 99–603, 100 Stat. 3359 (1986) (IRCA), Congress extended full Medicaid eligibility for prenatal care to certain groups of legalized aliens. 8 U.S.C.A. § 1255a(h)(3)(B)(i)(II) (West Supp.1991). The Secretary concludes from this that Congress knew how to create eligibility for prenatal care when it wanted to, and in OBRA '86 simply chose not to for non-PRUCOL aliens.

However, the Secretary's reading fails to fully account for the structure of IRCA. IRCA allows non-PRUCOL aliens who have been residing illegally since January 1, 1982 and who meet certain qualifications to receive an upgrade in immigration status to that of "an alien lawfully admitted for temporary residence." § 1255a(a). As a price for the immigration upgrade, Section 1255a(h)(1)(A)(ii) of IRCA bars IRCA-legalized aliens, for five years after legalization, from receiving any Medicaid coverage except as provided in sections (h)(2) & (h)(3). Section (h)(2) provides that section (h)(1) does not apply to certain Cuban and Haitian entrants or to the aged, the blind or the disabled. Section (h)(3) provides that section (h)(1) does not apply to bar receipt of emergency and prenatal care. Thus, far from expressing a view about what Medicaid coverage Congress believed other non-PRUCOL aliens were entitled to, section (h)(3) simply expresses Congress' view that even when Congress requires an alien to forego government benefits as the price for enhancement in immigration status, prenatal care is too important to give up. Once again, the Secretary has mistaken Congressional solicitude for prenatal care in one area for an intent to deny access to prenatal care in every other area.

To sum up, the complexity of the statutory scheme, the legislative history of the alienage restriction, the uncertainty of the state of the law at the time of the enactment of the alienage restriction, and the anomalies that result from the Secretary's position all indicate that Congress did not realize the effect of the alienage restriction on prenatal care. The Secretary's argu-

ments to the contrary reveal only that Congress generally considered prenatal and delivery services important. In short, we are persuaded that when Congress passed OBRA '86, it did not foresee that the blanket alienage restriction would have the effect of denying prenatal care to future citizens. That, however, is the beginning, not the end, of the analysis. We must also determine whether this unexpected result is contrary to the clearly expressed intent of Congress.

### B

In the ordinary case, we would be reluctant to conclude that even an unexpected result conflicted with Congressional purpose. Here, however, the purpose of Congress in enacting OBRA '86 and the long history of Congressional treatment of prenatal care point decisively in a direction opposite to the one the Secretary urges. Accordingly, here we can confidently state that denying prenatal care to non-PRUCOL women conflicts with Congress' intent.

OBRA '86 was a budget reconciliation act. Congress' basic purpose was to "achieve net expenditure reductions" while "achiev[ing] certain program improvements." H.Rep. 99–727 at 68, *reprinted in* 1986 U.S.C.C.A.N. at 3658. The Secretary does not deny that providing prenatal care is cost effective. Indeed, that conclusion is intuitive. Studies have shown that every dollar spent on prenatal care saves between two and ten dollars in future medical care costs. *See* Committee to Study the Prevention of Low Birthweight, Institute of Medicine, *Preventing Low Birthweight Summary* 22 (1985) (every dollar spent on prenatal care can save $3.38 in health care costs for low birth weight infants in the first year of life); H.Rep. No. 99–727, 99th Cong. 2d Sess. at 98, *reprinted in* 1986 U.S.C.C.A.N. at 3607, 3688 (discussing Southern Governor's Regional Task Force on Infant Mortality's study finding that one dollar of prenatal care saves between two and ten dollars in medical costs). Indeed, in other parts of OBRA '86, Congress relied on the cost effectiveness of prenatal care in its decision to expand Medicaid cov-

erage for prenatal care. *See* H.Rep. No. 99–727 at 130, 1986 U.S.C.C.A.N. at 3719–20. *See also* H.Rep. No. 100–391, 100th Cong. 1st Sess. at 437 (1987), U.S.Code Cong. & Admin.News, pp. 2313–1, 2313–257. In short, there can be little question that denying prenatal care to non-PRUCOL aliens undermines the clearly expressed Congressional purpose of curbing expenditures.

Our conclusion that the Secretary's policy conflicts with Congressional purpose is further solidified by the fact that Congress has over the years unequivocally expressed its desire to continue to expand access to prenatal care. In addition to the expansions in prenatal care discussed in Part I above, Congress has lifted the financial ceiling for optional Medicaid coverage to pregnant women first to 100 percent of the poverty level, OBRA '86, § 9401, and later up to 185 percent of the poverty level. Omnibus Budget Reconciliation Act of 1987, Pub.L. 100–203, § 4101, 101 Stat. 1330–31 (1987). Congress has also lifted the financial ceiling for mandatory coverage for pregnant women to 133 percent of the poverty level. P.L. 100–360 § 302(a), 102 Stat. 750–51 (1988). Thus, this case presents the extremely rare instance where we can discern a clearly expressed Congressional intent contrary to the plain language of the statute. Had Congress realized the implications of the alien restriction, it would most certainly not have cut off prenatal care to non-PRUCOL women. In short, this is the rare case like *Rose* where refusing to extend a broad statutory prohibition to a situation Congress did not foresee is necessary in order to avoid impeding a clearly expressed Congressional purpose.

In reaching this conclusion, we necessarily reject the claim that Congress, had it realized the implications of the alienage restriction, would have concluded that immigration policy required barring the provision of prenatal care to non-PRUCOL aliens. While we express no view on whether Congress could, constitutionally, make such a choice, we do note that "legislation directing the onus of a parent's misconduct against his children does not comport with fundamental conceptions of jus-

tice." *Plyler v. Doe*, 457 U.S. 202, 220, 102 S.Ct. 2382, 2396, 72 L.Ed.2d 786 (1982). Accordingly, we are unwilling to over-ride Congress' clearly expressed intention to curb expenditures by expanding prenatal care without more persuasive indicia of Congressional intent than are present here. *Cf. Doe v. Reivitz*, 830 F.2d 1441, 1445 (7th Cir.1987) ("we must not lose sight of the fact that the agency's policy is to deny, solely on the basis that their parents are illegal aliens, AFDC–UP benefits to children who are U.S. citizens.... To hold this practice valid, we must therefore find that the impact on children comports with the language of the statute and with the intent of the legislature."), *amended*, 842 F.2d 194 (7th Cir.1988).

### IV

The Secretary contends, however, that even if we disagree that the plain language compels the course that the Secretary has taken, and even if we discern an intent contrary to the one that the Secretary has found, nonetheless the Secretary's interpretation of the statute must be affirmed so long as it is a permissible construction of the statute. *See Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984).

However, it is not clear here precisely what position of the Secretary this court ought to defer to. The Secretary points to a response to a comment published in the federal register. The commentator asked whether non-PRUCOL pregnant women could receive Medicaid benefits for prenatal care, and the Secretary responded that they could not. 55 Fed.Reg. 36,816 (1990). However, this response, coming while plaintiff's motion for a permanent injunction was pending, is the sort of *post hoc* litigation posture that is entitled to no deference. *See Bowen v. Georgetown Univ. Hospital*, 488 U.S. 204, 212–13, 109 S.Ct. 468, 473–74, 102 L.Ed.2d 493 (1988).

The Secretary responds that he could not possibly have taken a position before the litigation commenced, since this litigation produced OBRA '86 which in turn, the Sec-

retary claims, authorized the bar on prenatal care. Nonetheless, the Secretary has not explained why he failed to publish this policy until 1990. Neither the 1988 proposed regulations implementing OBRA '86, 53 Fed.Reg. 38,032 (1988), nor the 1987 final regulations implementing DRA '84 and COBRA '85, 52 Fed.Reg. 43,063 (1987), take any position on the effect of OBRA '86 on the eligibility of non-PRU-COL women for prenatal care.

If anything, the 1987 regulations seem to indicate that OBRA '86 does not bar such coverage. In the 1987 regulations, the Secretary took the position that "[i]n determining whether a woman would be eligible under the provisions of section [1396d](n)(1)(C) of the Act, State Medicaid agencies must apply only the financial eligibility criteria of the State's approved AFDC plan." *Id.* at 43,065. Thus, after this litigation had commenced, and after OBRA '86, the Secretary published a position inconsistent with the one he offers now. While this alone is not enough to defeat the Secretary's claim of deference, *see Rust v. Sullivan*, —— U.S. ——, 111 S.Ct. 1759, 114 L.Ed.2d 233 (1991), it does undermine the Secretary's claim that the 1990 position is anything more than a litigation posture.

■ Finally, while we are mindful of the general rule that in interpreting a statute of this complexity, the agency's position carries special weight, *DeJesus*, 770 F.2d at 327, here the agency's position is not based on any expertise in the statute's realm. Rather, the only justification that this health agency offers is that "immigration policy" requires precluding non-PRUCOL pregnant women from receiving prenatal care. Surely the Secretary of Health and Human Services has no special expertise in deciding what makes good immigration policy, the province of a wholly separate executive department. *See Hampton v. Mow Sun Wong*, 426 U.S. 88, 116, 96 S.Ct. 1895, 1911, 48 L.Ed.2d 495 (1976) (Civil Service Commission not entitled to deference in determining constitutionality of regulation excluding all aliens from civil service). We note that we have no indication that the

Attorney General, who bears primary responsibility for immigration policy, has ever taken a position favoring denial of prenatal care to non-PRUCOL pregnant women. Accordingly, there is no need in this case to give special weight to the Secretary's interpretation of the act.

### Conclusion

After examining the legislative history and the statutory context of OBRA '86, we conclude that Congress did not intend to prevent otherwise eligible pregnant women from receiving prenatal care to benefit their future citizen children. Further, we conclude that the Secretary's determination to the contrary is not entitled to deference. Finally, since the case can be resolved on statutory grounds, we express no opinion on plaintiffs' constitutional challenge. Accordingly, the decision of the district court is affirmed.

### ON PETITION FOR REHEARING

For the reasons stated below, the Secretary's petition for rehearing is denied.

The Secretary contends that our decision, "by its own terms, directly violates a host of black letter rules of statutory construction which the Supreme Court has unequivocally reaffirmed in no less than five different cases decided within the past year." Upon review, we conclude that the Secretary mistakes grey for black, as the cases which he cites—first brought to our attention now on petition for rehearing—do not dictate a contrary result than the one we have reached. Indeed, they are inapposite.

Relying primarily on *Union Bank v. Wolas*, —— U.S. ——, 112 S.Ct. 527, 116 L.Ed.2d 514 (1991); *Ardestani v. INS*, —— U.S. ——, 112 S.Ct. 515, 116 L.Ed.2d 496 (December 10, 1991); *Toibb v. Radloff*, —— U.S. ——, 111 S.Ct. 2197, 115 L.Ed.2d 145 (1991); and *West Virginia University Hospitals, Inc. v. Casey*, —— U.S. ——, 111 S.Ct. 1138, 113 L.Ed.2d 68 (1991), the Secretary argues that we are limited to the plain language of OBRA '86 in giving the Medicaid Act its proper construction. As we explicitly stated in our opinion, were this an ordinary case of statutory construc-

tion, we would agree. *See* op. at 1215 ("In the usual case, where the language of the statute is clear, that is the end of the analysis."). However, this is not, by any means, an ordinary case.

We have found no decisions, including those relied upon by the Secretary, which hold that the plain meaning of a statute invariably controls its construction—regardless of the self-defeating and harmful consequences that would ensue. To the contrary, the Secretary concedes, as he must, *see* Secretary's Petition for Rehearing at 6, that a statute's "plain meaning" is not an absolute command to be blindly followed in every case.

In *Ardestani v. INS*, 112 S.Ct. at 520, cited by the Secretary, the Supreme Court recently characterized the plain meaning rule as a " 'strong presumption,' " stating: "The 'strong presumption' that the plain language of the statute expresses congressional intent is rebutted only in 'rare and exceptional circumstances,' ... when a contrary legislative intent is clearly expressed." *Id.* (citations omitted). *See also, United States v. Ron Pair Enterprises, Inc.*, 489 U.S. 235, 242, 109 S.Ct. 1026, 1031, 103 L.Ed.2d 290 (1989) ("The plain meaning of legislation should be conclusive, except in the 'rare cases [in which] the literal application of a statute will produce a result demonstrably at odds with the intentions of its drafters' ") (quoting, *Griffin v. Oceanic Contractors, Inc.*, 458 U.S. 564, 571, 102 S.Ct. 3245, 3250, 73 L.Ed.2d 973 (1982)); *INS v. Cardoza-Fonseca*, 480 U.S. 421, 432, n. 12, 107 S.Ct. 1207, 1213, n. 12, 94 L.Ed.2d 434 (1987) ("we look to the legislative history to determine only whether there is 'clearly expressed legislative intention' contrary to that language, which would require us to question the strong presumption that Congress expresses its intent through the language it chooses"); *Rubin v. United States*, 449 U.S. 424, 430, 101 S.Ct. 698, 701, 66 L.Ed.2d 633 (1981) ("When we find the terms of a statute unambiguous, judicial inquiry is complete, except 'in "rare and exceptional circumstances." ' ") (quoting, *TVA v. Hill*, 437 U.S. 153, 187, n. 33,

98 S.Ct. 2279, 2298, n. 33, 57 L.Ed.2d 117 (1978)). Thus, in a particular case, where "rare and exceptional" circumstances exist, the plain language of a statute may not be controlling.

Similarly, in *Union Bank v. Wolas*, 112 S.Ct. at 530, the Court remarked that "[g]iven the clarity of the statutory text, respondent's *burden of persuading* us that Congress intended to create or preserve a special rule for long-term debt is exceptionally heavy." *Id.* (emphasis added). We note that where there is a burden there is a possibility, however slim, of moving a court to consider legislative history. Thus, we do not read *Union Bank* to prohibit a court from ever looking beyond the text of the statute when construing its unambiguous language.

Indeed, in *Union Bank*, the Court did not reflexively adhere to the plain meaning of the challenged provision in the 1978 Bankruptcy Code. Instead, the Court examined the legislative history to see if it exhibited a manifest intent contrary to the Code's actual language. Upon review, the Court found that Congress had thoughtfully considered the full range of the implications that would stem from its actions and, therefore, the statute's clear language governed its interpretation. "[T]he fact that Congress carefully reexamined and entirely rewrote the preference provision in 1978 support[ed] the conclusion that the text of § 547(c)(2) as enacted reflects the deliberate choice of Congress." *Id.*, op. at 532. However, as we discuss at some length in our opinion, *see* op. at 1215–1218, we are convinced that Congress *did not* similarly have a comprehensive view of the relevant statutory scheme when it passed the blanket alienage restriction of OBRA '86.

In *Toibb v. Radloff*, supra, the Court cited as one of its reasons for refusing to look behind the clear terms contained in Chapter 11 of the Bankruptcy Code the "scant history on th[e] precise issue," which did "not suggest a 'clearly expressed legislative inten[t] . . . contrary . . .' to the plain language of § 109(d)." *Id.*, 111 S.Ct. at 2200. The difference between *Toibb* and the present case, on this point, could not be greater. Here, the legislative history is abundant, and leads inexorably to the conclusion "that Congress has over the years unequivocally expressed its intent to continue to expand access to pre-natal care." Op. at 1219. This expression of congressional intent, as it pertains to newborns who will be United States citizens at birth, directly conflicts with the plain language of OBRA '86, and thus warrants further inquiry into the statute's meaning.

■ Furthermore, *Toibb* suggests appropriately that where enforcement of a statute's unambiguous language would inflict an apparently uncontemplated harm upon a legally protected class, recourse to the legislative history may be had in determining the statute's true goal. The Court stated: "Absent some showing of harm to the creditors of a nonbusiness debtor allowed to reorganize under Chapter 11, we see nothing in the allocation of 'burdens' and benefits of Chapter 11 that warrants an inference that Congress intended to exclude a consumer debtor from its coverage." *Id.*, 111 S.Ct. at 2201. Given Congress' avowed commitment to providing funds for prenatal care, its stated concern for the healthy development of fetuses, and the congressionally recognized magnitude of harm that will be inflicted on fetuses by depriving them of prenatal care—in this case, harm to children virtually all of whom will become United States citizens and thereby eligible to receive Medicaid—we think *Toibb* supports our method of statutory construction.

Finally, we find *West Virginia Hospitals, Inc. v. Casey*, supra, wholly distinguishable. In that case, the Court reversed an award of expert witness fees granted pursuant to 42 U.S.C. § 1988, since the statute merely allowed for a prevailing party to recoup "a reasonable attorney's fee." The Court rejected the argument that because Congress had passed and amended *other* fee shifting statutes to include expert fees *after* the passage of § 1988, the plain language of § 1988 should be judicially expanded to cover "expert fees." The argument continued that since "Congress simply forgot" to address § 1988's initial failure to provide for expert

fees, it is the court's "duty to ask how they would have decided had they actually considered the question." *Id.*, 111 S.Ct. at 1148.

The Court condemned this line of reasoning as judicial "usurpation" of legislative prerogative. *Id.* It stated:

> Where what is at issue is not a contradictory disposition within the same enactment, but merely a difference between the more parsimonious policy of an earlier enactment and the more generous policy of a later one, there is no more basis for saying that the earlier Congress forgot than for saying that the earlier Congress felt differently. In such circumstances, the attribution of forgetfulness rests in reality upon the judge's assessment that the later statute contains the better disposition.

*Id.*

We agree. But what *is* at issue in the present case is exactly what was *not* at issue in *West Virginia University Hospitals*—"a contradictory disposition within the same enactment."

Congress has consistently extolled the cost-effectiveness of prenatal care for the reason that it invariably costs more to treat the hardships of birth defects post-natally than it does to limit or totally prevent them *in utero*. By broadly funding prenatal care, Congress has rationally embraced the wisdom of preventive medicine. In construing Congress' intent with respect to the alienage restriction, we cannot forget that OBRA '86 was itself enacted as *budget reduction* legislation and, to further that goal, it explicitly expanded access to prenatal care by lifting the financial ceiling for optional Medicaid coverage to pregnant women. *See,* OBRA '86, § 9401, slip op. at 1219. By reducing budgetary costs, the general exclusion of aliens from Medicaid, pursuant to the restriction, makes economic sense. Thus, it is consistent with the enactment's goal. However, it makes no sense, and is wholly inconsistent with the Congress' intentions, to preclude fetuses of alien mothers from receiving prenatal care. At the moment of their birth in this country, these children become United States citizens and will be eligible for Medicaid. *See* eligibility discussion at op. 1217–1218. As Congress was aware, at that point the medical neglect that these children suffered during their mothers' pregnancies will come home to roost in the health care system, at exponentially higher costs. *See* op. at 1219. Thus, to apply the alien restriction of OBRA '86 to fetuses would be internally inconsistent with the statute's intended purpose. Nothing in *West Virginia University Hospitals* mandates that we do so.

In short, this is that "rare and exceptional circumstance" where the particular application of the Medicaid Act's alienage restriction urged by the Secretary would fly in the face of legislative history, *see Ardestani,* 112 S.Ct. at 520; *Ron Pair Enterprises,* 489 U.S. at 242, 109 S.Ct. at 1031, and would create affirmative harms that Congress—through legislative endeavors over the past 10 years, including the specific statute at issue—has continually sought to alleviate. *See Toibb,* 111 S.Ct. at 2201. By recognizing that Congress, in its general alien restriction on Medicaid, did not intend to bar prenatal care for fetuses who in all likelihood will become citizens of this country, we do not undermine congressional intent as embodied in a broad statutory proscription. Rather, we define the proscription so as to give effect to clear congressional purpose. While our decision may be viewed as recognizing an exception to the OBRA '86 alienage restriction, *see Rose v. Rose,* 481 U.S. 619, 634, 107 S.Ct. 2029, 2038, 95 L.Ed.2d 599 (1987) (discussed in depth supra, op. at 1215–1216), it may also be viewed as recognizing that the intent of that restriction pertains only to medical services for aliens, including alien mothers—not to services intended for the needed care of putative future United States citizens.

Contrary to the Secretary's characterization, this construction of the law does not represent "judicial legislation" in derogation of the judicial function. As the Court made evident in *Rose,* it is precisely the judicial function to render an internally inconsistent statute meaningful—not based

upon what the judge thinks best, but upon what Congress clearly intended. We note that under these circumstances, it remains "emphatically the province and duty of the judicial department to say what the law is." *Marbury v. Madison,* 5 U.S. (1 Cranch.) 137, 177, 2 L.Ed. 60 (1803).

Accordingly, we deny the Secretary's petition for rehearing.