**MICHIGAN DEPARTMENT OF SOCIAL SERVICES,** individually and as assignee and/or subrogee of Lewis Abernathie, Oneda Abbott, Minnie Ackenbach, Gordon Aalderink, Earnest Adams, Rene Abbott, and Carrie Adolph, et al., a representative group of thousands of individuals who have received, or will receive, Medicaid benefits and may be eligible for Medicare benefits, Plaintiffs,

v.

Donna **SHALALA,** Secretary, United States Department of Health and Human Services, Blue Cross and Blue Shield of Michigan, Aetna Insurance Company and Travelers Insurance Company, Defendants.

No. 5:92–CV–95.

United States District Court,
W.D. Michigan,
Southern Division.

June 30, 1994.

Frank J. Kelley, Atty. Gen., William R. Morris, Asst. Atty. Gen., Lansing, MI, for plaintiffs.

Daniel M. LaVille, Asst. U.S. Atty., Grand Rapids, MI, Lyn S. Crozier, Office of Gen. Counsel, U.S. Dept. of Health & Human Services, Baltimore, MD, for defendants.

## MEMORANDUM OPINION

McKEAGUE, District Judge.

This case presents an attempt by the Michigan Department of Social Services ("DSS") to obtain reimbursement of Medicaid benefits paid by it from the Secretary of the Department of Health and Human Services (hereinafter "Secretary" or "HHS"), as administrator of the Medicare program. Through motions for summary judgment, the parties have raised numerous legal issues. The Court heard oral arguments on these motions on February 7, 1994, and issued a preliminary ruling from the bench; a written opinion and order to follow. This memorandum opinion incorporates and memorializes the Court's rulings.

## I. FACTUAL BACKGROUND

DSS is the state agency charged with administering the Medicaid program, providing medical assistance to the indigent. 42 U.S.C. § 1396 *et seq.* Medicaid is jointly funded by state and federal monies. Among Medicaid benefits is coverage for health care received by eligible persons in a "skilled nursing facility." The named individual plaintiffs in this case are said to be representative of some 10,000 Medicaid beneficiaries who received covered care in a skilled nursing facility.

Under the congressional scheme, "Medicaid is intended to be the payor of last resort." See *New York State Dep't of Social Services v. Bowen,* 846 F.2d 129, 133 (2nd Cir.1988). Hence, state agencies are required to "take all reasonable measures to ascertain the legal liability of third parties" to pay for Medicaid-covered care and to seek reimbursement for benefits paid to the extent of such legal liability. 42 U.S.C. § 1396a(a)(25)(A) and (B).

Some persons eligible for Medicaid benefits are also eligible for assistance under Medicare, providing benefits for the aged and infirm. 42 U.S.C. § 1395 *et seq.* Medicare is administered by the defendant Secretary and is funded solely by the federal government. DSS contends the Medicaid beneficiaries of which the individual named plaintiffs are a representative group, are "dually eligible" persons. Having paid Medicaid benefits on their behalf, DSS, as their statutory subrogee or otherwise authorized representative, seeks reimbursement from HHS to the extent of its legal liability. DSS, thus, characterizes HHS as a potentially liable "third party" and purports to be discharging its statutory obligation by seeking reimbursement from HHS.

DSS has pursued reimbursement by availing itself of the Secretary's administrative claims and appeals process. 42 C.F.R. § 424.30 *et seq.;* 42 C.F.R. § 405.701 *et seq.* This process requires that a provider of services submit a written request for payment to an HHS fiscal intermediary. The request for payment or claim must be signed by the beneficiary of services. If the beneficiary cannot sign because of physical or mental incapacity, an authorized representative may sign. The intermediary reviews the claim and determines whether it is procedurally proper and whether the subject services are covered by Medicare. If the claim is denied, the intermediary provides notice to the provider and the beneficiary, after which either party may seek reconsideration within 60 days. A party dissatisfied after reconsideration may appeal for a hearing before an administrative law judge in the Social Security Administration Office of Hearings and Appeals. Further review is available before the Appeals Council, and ultimately in the United States District Court.

DSS, being neither a provider nor a beneficiary, availed itself of this process in one of two different ways. First, it signed and submitted more than eight thousand claims as assignee or subrogee of beneficiaries whose skilled nursing care had been covered under Medicaid rather than Medicare. These claims are the subject of count II of the first amended complaint. DSS alleges the Secretary has denied these claims without considering the merits, erroneously concluding that DSS lacks standing. In count II, DSS seeks (1) a declaration that it does have standing to pursue reimbursement and (2) remand of these thousands of claims to the Secretary for review on the merits.

Second, DSS also pursued claims on behalf of 1,165 beneficiaries who had authorized it or its contractor, Sixty Plus, Inc., to serve as their representative. These claims are the subject of count I of the complaint. DSS alleges these claims were erroneously denied through a procedure which violated procedural due process in various particulars. DSS asks the Court to declare that it has standing to pursue these claims, to declare the procedure employed by the Secretary unlawful, and to remand these claims for fair and impartial review on the merits.

## II. COUNT II CLAIMS

### A. DSS Standing

■ The question of DSS's standing to pursue the claims contained in count II is the subject of cross-motions for summary judgment. The parties agree it is a question of law. DSS's asserted right to subrogation arises primarily from state statute. Under M.C.L. § 400.106(1)(b)(ii), DSS "shall be subrogated to any right of recovery which a patient may have for the cost of hospitalization, ... and other medical services not to exceed the amount of funds expended by the Department for the care and treatment of the patient." Under Michigan law, the general standards governing subrogation are summarized as follows:

Regardless of whether a right of subrogation arises by operation of law or by contractual agreement, the controlling general principles are the same: the subrogee, upon paying an obligation owed to the subrogor as the primary responsibility of a third party, is substituted in the place of the subrogor, thereby attaining the same (and no greater) rights to recover against the third party. Payment of the subrogated debt or liability is a prerequisite to attaining subrogation rights.

*Morrow v. Shah,* 181 Mich.App. 742, 749, 450 N.W.2d 96 (1989) (citations omitted).

In support of its position that these state subrogation principles should be recognized under the federal administrative review procedures, DSS cites *New York State D.S.S. v. Bowen,* 846 F.2d 129 (2nd Cir.1988). In *NYSDSS,* the Second Circuit recognized the right of a state agency to appeal denials of Medicare coverage as statutory subrogee of Medicaid beneficiaries. The Secretary refuses to recognize the applicability of *NYSDSS* for two reasons, arguing the ruling is controlling only in the Second Circuit and is factually distinguishable in that it deals with the subrogee's right to appeal, not the right to file initial claims.

The Secretary's reasons are not persuasive. Granted, *NYSDSS* is not controlling. However, it is practically the only decisional authority on the subrogation standing question and its reasoning is persuasive. No contrary authority from the Sixth Circuit or elsewhere has been cited to the Court. The New York statutory basis for the state's rights in subrogation is substantially identical to Michigan's. The *NYSDSS* court evaluated the Secretary's objections to standing, based on technical readings of federal regulations and on administrative efficiency concerns, and rejected them as reflecting "tunnel vision."

The Secretary is right in arguing that *NYSDSS* is technically factually distinguishable, but the difference is immaterial. In fact, as DSS has argued, the fact that it has attempted to enforce its subrogation rights at the initial claim stage, rather than at the administrative appeal stage, would appear to militate even more strongly in favor of finding it has standing as the real party in interest involved *ab initio.*

Granted, federal statutes and regulations do not explicitly authorize claims and appeals by state agencies. Yet, no good reason to disregard traditional subrogation principles has been offered. The Secretary did not offer persuasive argument to the Second Circuit in *NYSDSS;* the court refused to give deference to the Secretary's interpretations of the statutes and regulations because they were "inconsistent" and "in defiance of common sense." 846 F.2d at 134. Neither has the Secretary presented persuasive argument to this Court. If *NYSDSS* represents an aberrational, erroneous ruling, Congress can be expected to have corrected the error through legislation by now, some six years later. It has not done so. There has been no legislative action and no significant judicial action since *NYSDSS.*

Accordingly, the Court concludes DSS has standing via subrogation to pursue reimbursement of monies it has paid under Medicaid for care for which Medicare may be primarily liable.

## B. Subject Matter Jurisdiction

 The Secretary also challenges the claims presented in count II on the basis of subject matter jurisdiction. The Secretary correctly argues, based on 42 U.S.C. § 405(h), that judicial review pursuant to 42 U.S.C. § 405(g) is the exclusive basis for federal court jurisdiction over claims arising under the Medicare Act.[1] *Heckler v. Ringer,* 466 U.S. 602, 614–15, 104 S.Ct. 2013, 2021–22, 80 L.Ed.2d 622 (1984); *Westchester Mgmt.*

---

1. Judicial review of social security claims is governed by 42 U.S.C. §§ 405(g) and 405(h). Under 405(g):

 [a]ny individual, after any final decision of the Secretary made after a hearing to which he was a party, irrespective of the amount in controversy, may obtain a review of such decision by a civil action commenced within sixty days after the mailing to him of notice of such decision or within such further time as the Secretary may allow. Such action shall be brought in the district court of the United States for the judicial district in which the plaintiff resides or has his principal place of business, or, if he does not reside or have his

 principal place of business within any such judicial district, in the United States District Court for the District of Columbia.

 Section 405(h) states:
 The findings and decision of the Secretary after a hearing shall be binding upon all individuals who were parties to such hearing. No findings of fact or decision of the Secretary shall be reviewed by any person, tribunal, or governmental agency except as herein provided. No action against the United States, the Secretary, or any officer or employee thereof shall be brought under section 1331 or 1346 of Title 28 to recover on any claim arising under this sub-chapter.

*Corp. v. U.S. Dep't of Health & Human Serv.,* 948 F.2d 279, 282 (6th Cir.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 1936, 118 L.Ed.2d 543 (1992); *Livingston Care Ctr., Inc. v. United States,* 934 F.2d 719, 721–22 (6th Cir.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 636, 116 L.Ed.2d 654 (1991). This "claim arising under" language has been broadly construed to include "any claims in which both the standing and the substantive basis for the presentation of the claims is the Social Security Act." *Heckler,* 466 U.S. at 615, 104 S.Ct. at 2022. Both of these criteria are clearly satisfied by the claims presented in count II. It is of no consequence that DSS seeks only declaratory and injunctive relief and not an actual award of benefits as well. *Id.* Under the circumstances, there is no general federal question jurisdiction under 28 U.S.C. § 1331; DSS must comply with the judicial review requirements of 42 U.S.C. § 405(g).

■ "Administrative exhaustion" is prerequisite to judicial review. *Willis v. Sullivan,* 931 F.2d 390, 396 (6th Cir.1991). The requirements of this exhaustion are summarized as follows:

> Three conditions must be satisfied to obtain judicial review under § 405(g): (1) a final decision of the Secretary after a hearing; (2) commencement of a civil action within sixty days after mailing of notice of such decision, or within such additional time as the Secretary may permit; (3) filing of the action in the appropriate district court. The last two requirements are waivable by the parties; the first requirement of a final decision, because it is "central to the requisite grant of subject-matter jurisdiction," is not waivable.

*Id.,* (citations omitted). With respect to the first of the above conditions, the *Willis* court explained further:

> The Supreme Court has held that the finality requirement consists of two elements. First, a claim for benefits must be presented to the Secretary. This element is jurisdictional, and absent such a claim there can be no review. Second, the decision must be final in that the claimant has exhausted the administrative remedies prescribed by the Secretary. This element

is not jurisdictional and can be waived by the Secretary, and in certain circumstances, the court.

■ The Secretary first challenges DSS's satisfaction of the second condition, arguing this action was not commenced within 60 days after notice of the Secretary's final decision. The Secretary contends the notice of decision that triggered the running of the 60-day period consists in one of two things: (1) the letters of the Secretary's fiscal intermediaries in April and May of 1992 denying mass "notices of intent to file claims" and "simultaneous reconsiderations;" or (2) the letter of Lyn Crozier, counsel for defendant, to William Morris, counsel for DSS, dated May 18, 1992, explaining that the Secretary agreed to waive exhaustion defenses, enabling DSS to proceed with litigation. This action was commenced on August 25, 1992, some 99 days after May 18, 1992.

In retrospect, the import of the above cited letters is fairly clear. A careful reading of the May 18, 1992 letter from Lyn Crozier in conjunction with the intermediaries' letters, should certainly have put DSS on notice that it had reached the end of the administrative line and should prepare for litigation. On the other hand, none of the letters is labelled "Notice of Final Decision" or includes explicit language to that effect, and none of them informs the reader generally of appeal rights or specifically of the applicable 60-day period.

Under these circumstances, it would be inequitable to deny judicial review because of this technical timeliness defect. The identity of the "final decision" is ambiguous even to the Secretary, who relies on one of two possible sources or both of them viewed together. The instant complaint was filed less than six weeks after the 60-day period might be deemed to have expired. The Secretary has not argued or demonstrated that she suffered any prejudice as a result of this short tardiness. Finally, the primary issue presented by count II, recognition of DSS's subrogation standing, is wholly collateral to the actual claims for benefits, a circumstance under which the Court may itself waive this non-jurisdictional exhaustion requirement. *Ahghazali v. Sec'y of H.H.S.,* 867 F.2d 921,

**1120**

926 (6th Cir.1989). Hence, the "tardiness" of this action will not be allowed to impede judicial review.

■■■ Next, the Secretary raises an objection that calls into question the first condition of administrative exhaustion, the final decision requirement. This condition entails two elements. First, a claim for benefits must have been presented to the Secretary; and second, administrative remedies must have been exhausted. By the letter of May 18, 1992, the Secretary has expressly waived her right to challenge the second element. Her objection thus goes to the "presentment of a claim" requirement, which is jurisdictional, and cannot be waived by the Secretary or the Court. See *Willis, supra.*

■■ The Secretary does not dispute that claims for Medicare benefits have been presented to her fiscal intermediaries and have been finally denied. Viewed in this generalized sense, there is no question but that the presentment requirement has been satisfied. The Secretary, however, chooses to define "claim" in a very strict, narrow sense, arguing that a claim can only be deemed to have been presented to the Secretary if it was *properly* presented to the Secretary. Thus, she argues DSS has not presented claims, because the claims received and denied were not submitted first to the Medicaid beneficiaries' care providers in the form of "demand bills," as required in the Medicare Intermediary Manual.

The intermediary manual is an instructional or guideline booklet provided to fiscal intermediaries. It describes the common procedure whereby a patient (potential Medicare beneficiary) seeks Medicare coverage first by requesting it through the care provider. If the provider believes the care provided is not covered by Medicare, it so informs the patient, who then may insist the claim be submitted notwithstanding the provider's initial determination. The provider then submits the "demand bill" to the intermediary with explanation of its non-coverage determination.

■■■ While this manner of proceeding may be orderly and efficient, the procedure appears not to be set forth in terms so explicit and mandatory as to constitute an essential prerequisite to judicial review. In fact, it appears the intermediary manual, prescribing merely internal agency procedures, has no legal force. See *Lewis v. Grinker,* 965 F.2d 1206, 1217 (2nd Cir.1992). DSS's alleged failure to follow standard procedures *may* be a procedural defect, but cannot legitimately be characterized as a jurisdictional defect. All that is required to satisfy the jurisdictional requirement is a "claim" sufficient to evoke a final decision from the Secretary.[2] The claims were presented to and denied by the intermediaries, and the Secretary has placed her stamp of finality on the denials by agreeing to consider the claims administratively exhausted. This is sufficient to satisfy the first and only jurisdictional prerequisite to judicial review, a "final decision."[3]

Accordingly, the Court concludes it has subject matter jurisdiction to conduct judicial review of the Secretary's decisions on the count II claims.

### C. "Merits" of Count II Claims

Having determined that DSS has standing and that the Court has jurisdiction to con-

---

2. See e.g., *Heckler v. Ringer, supra,* where the Supreme Court impliedly held that a claimant who had not yet had the contemplated surgery or incurred reimbursable expenses had a cognizable "claim" under § 405(g), albeit an invalid one. 466 U.S. at 621, 104 S.Ct. at 2024. That is, even though the Medicare Act prohibits the filing of a claim before the services to be covered are furnished, a premature claim is nonetheless a claim. In other words, by analogy, it is reasonable to conclude that if a claim so flawed in substance, not just procedure, is a cognizable claim for purposes of jurisdiction, then the instant claims, arguably marred by a technical procedural defect, are too.

3. Therefore it is unnecessary to consider the question whether demand bills were in fact submitted. DSS adamantly contends they were. The Secretary demands hard evidence. The Court suggested DSS file copies of the demand bills to put the issue, relevant or not, to rest. DSS has still filed little more than an affidavit of a Sixty Plus official attesting that demand bills were submitted. The affidavit is sufficient, at least, to create a question of fact regarding the submission of demand bills; but the question is not presently material because a showing that they were submitted is not essential to establishment of exhaustion for jurisdictional purposes.

duct judicial review, the Court has addressed the issues directly raised with respect to the count II claims for reimbursement. DSS would have the Court remand these claims to the Secretary for consideration of the merits, something the Secretary has not done. Such an order would be appropriate at this stage if it were clear that the count II claims were denied solely because of DSS's perceived lack of standing. However, if the letters from the intermediaries in April and May 1992 are deemed to embody the reasons for the denials, then lack of standing, *per se*, may have had less to do with the denials than other identified procedural defects. Standing is not even mentioned in the letters of denial. The intermediaries, through uniform letters, denied the count II claims: (1) because they were not signed by the beneficiaries or accompanied by appointments of Sixty Plus to act as representative; (2) because they did not set forth the required particularized circumstances of incapacity for each beneficiary that would justify representation by Sixty Plus; (3) because they were not premised upon timely-filed demand bills; and (4) because they included inappropriate requests for "simultaneous" or "concurrent" reconsideration.

█ Assuming these are alternative reasons for the denials of the count II claims, remand for consideration of the merits is appropriate only if the Court determines these reasons are arbitrary, capricious, an abuse of discretion, not supported by substantial evidence or otherwise not in accordance with the law. Evaluation of these reasons is made easier in light of the foregoing treatment of the standing and exhaustion issues.

█ First, once the subrogation standing of DSS is established, by virtue of its having paid Medicaid benefits, DSS is deemed to stand in the shoes of the individual claimants with all the same rights as, but no greater rights than, the individual beneficiaries. DSS thus becomes "the claimant." The requirements that DSS obtain signatures of the beneficiaries and/or demonstrate the requisite incapacity of the beneficiaries to act as their representative, are thus rendered superfluous. Through the legal fiction of sub-rogation, DSS *is* the claimant. It provides its own signature, acts on its own behalf, and need not establish the incapacity of those whose rights it has statutorily assumed in pursuing its claims for reimbursement from Medicare. This conclusion is premised largely on common sense, which prevailed in *NYSDSS*, 846 F.2d at 134. It would be "hypertechnical and inconsistent" to require DSS, having already attained the rights of the beneficiaries through statutory subrogation, to go to the expense and delay of also obtaining the beneficiaries' express consent to assert those rights. *Id.* Thus, consistent with *NYSDSS*, the Court holds that the intermediaries' first two asserted reasons for the denials ignore DSS's rights in subrogation and are not in accordance with the law.

█ The third reason, generally denying claims not timely filed—in relation to the care provided for which reimbursement is sought—is legitimate. DSS, as subrogee, obtained no greater rights than the beneficiaries, and may obtain reimbursement only upon timely filed claims. The intermediaries' denials do not, however, reflect a claim by claim assessment of timeliness that would enable meaningful review. Hence, the facial legitimacy of this reason does not obviate the need for remand for particularized timeliness determinations.

█ The third reason may also be construed as basing denials of claims upon DSS's failure to present the claims in the form of demand bills. As indicated, *supra*, at page 1120, n. 3, a genuine question remains as to whether demand bills were presented with respect to some or all of the count II claims. The question, however, is not material.

Again, the demand bill requirement is set forth in the intermediary manual. It is not a creature of statute or agency rule but is a matter of internal administrative efficiency lacking the force of law. *Lewis, supra,* 965 F.2d at 1217. While the requirement may be sensible in the ordinary case and one with which DSS, like any other claimant, should ordinarily be expected to comply, this is not the ordinary case. The demand bill requirement clearly played no meaningful role in the

**1122**

denials of the instant claims. Considering the intermediaries' first two reasons for the denials and the Secretary's consistent objection to DSS's standing, it is clear that submission of the claims to the intermediaries by way of the care providers in the form of demand bills would have had absolutely no effect on the treatment of the claims. To insist on compliance with this technical requirement would be to require a futile act, a mere formality on the way to the courthouse. Under the circumstances, DSS's alleged failure to satisfy this requirement, solely, cannot justify the Secretary's refusal to consider the merits of the claims. To the extent the intermediaries' letters purport to rely on this technical defect as the reason for denying the claims, they represent an abuse of discretion.

█ The same reasoning applies with equal force to the fourth given reason for the denials, that DSS's requests for simultaneous or concurrent reconsideration were inappropriate. The "request for reconsideration" requirement is, of course, a legitimate step in the administrative exhaustion process. It appears DSS did not fully comply with this requirement with respect to many of the claims. Under the unique facts of this case, however, considering the DSS's mass filings and the Secretary's objection to DSS's standing, the requirement cannot be deemed to have played a meaningful role in the denial of the count II claims. Neither does the DSS's alleged failure to satisfy the requirement relieve the Secretary of responsibility for considering the merits of the claims. While it may be argued that enforcement of the "request for reconsideration" requirement appears to be an abuse of discretion only in light of resolution of the standing and jurisdictional issues, it is nonetheless now clear that reliance on this procedural hurdle is insufficient to justify avoiding the merits.

Therefore, the count II claims will be remanded to the Secretary for consideration of the merits, and the Secretary will be precluded from relying on the demand bill and request for reconsideration requirements as grounds for denying claims, but may evaluate the timeliness of the claims in relationship to the care provided.

### III. COUNT I CLAIMS

Count I pertains to 1,165 claims for reimbursement asserted by DSS as to which it had obtained beneficiary signatures and/or authorization to proceed as representative. These claims were not simply and finally denied by the intermediaries, but were referred for hearings. DSS alleges all of the claims were referred to the same administrative law judge ("ALJ"), who denied them without hearing. DSS challenges the procedure by which these claims were assigned to and denied by the ALJ, contending it is marred by several procedural due process defects. These alleged defects may be summarized as follows: (1) *ex parte* communications between the intermediaries and the ALJ prejudiced DSS's right to an impartial decisionmaker; (2) assignment of all claims to the same ALJ violated the policy requiring rotating assignment of claims among several ALJ's; and (3) the denial of claims without opportunity for hearing and presentation of facts is unfair. The Secretary has moved for dismissal or for summary judgment.

### A. Subject Matter Jurisdiction

█ The Secretary again questions whether the Court has jurisdiction to consider the claims presented in count I. Although DSS has characterized count I as a constitutional challenge which the Court may entertain under general federal question jurisdiction, 28 U.S.C. § 1331, the Secretary maintains the claims arise under the Medicare Act and are therefore subject to judicial review exclusively under 42 U.S.C. § 405(g). For the reasons stated at pages 1118–1119, *supra*, this Court agrees with the Secretary. The claims contained in count I arise under the Medicare Act. Plaintiffs may present their constitutional challenge through petition for judicial review under § 405(g). See *Livingston Care Ctr., supra*, 934 F.2d at 722.

█ Assuming count I represents such an action for judicial review, the Secretary continues, then it must be dismissed for lack of exhaustion.[4] The Secretary contends the

4. The exhaustion requirements are summarized at page 1119, *supra*.

claims contained in count I were dismissed for untimeliness without a hearing. Such dispositions, without a hearing, are said not to be "final decisions" subject to judicial review. The cases cited by the Secretary arguably support this position. See *Gutierrez v. R.R. Retirement Bd.*, 918 F.2d 567 (6th Cir. 1990); *Saline Community Hosp. v. Sec'y of Health & Human Serv.*, 744 F.2d 517, 520, n. 4 (6th Cir.1984); *Sheehan v. Sec'y of Health, Educ. & Welfare*, 593 F.2d 323, 325 (8th Cir.1979). Having failed to timely appeal the intermediaries' initial determinations, the count I plaintiffs failed to meet the prerequisites for a "final decision" and therefore failed to exhaust remedies, a jurisdictional defect.

■■■■ However, plaintiffs are not asking the Court to review the propriety of the decisions made on the count I claims. Rather, they raise a constitutional challenge to the general, but irregular procedure employed, whereby these 1,165 claims were assigned to the same administrative law judge, were tainted by *ex parte* communications, and were uniformly denied without hearing and without any apparent consideration of individual facts. Under these circumstances, it would be inappropriate to apply the exhaustion doctrine to deny plaintiffs judicial consideration of their constitutional challenge. The exhaustion doctrine is "intensely practical" and should not be mechanically applied where its purpose would not be served. *Bowen v. City of New York*, 476 U.S. 467, 484, 106 S.Ct. 2022, 2032, 90 L.Ed.2d 462 (1986). In *Bowen*, the Supreme Court held that the district court properly waived exhaustion where a system-wide unrevealed policy inconsistent with established regulations was alleged, and where nothing would have been gained—either through the compilation of a detailed factual record or from resort to agency expertise—by requiring exhaustion. *Id.*, at 484–85, 106 S.Ct. at 2032–33.

The count I claims present a situation closely analogous to that described in *Bowen*

and one which, exceptionally, justifies waiver of the exhaustion requirements—for purposes of subject matter jurisdiction.[5] Accordingly, the Court holds it has jurisdiction to consider plaintiffs' count I claims.

**B. Procedural Due Process**

■■■ The Secretary further contends there is no genuine issue as to any material fact and that the alleged due process violations do not rise to the level of a colorable constitutional claim. The argument does not require lengthy analysis. The allegations and factual showing presented by plaintiffs concerning the assignment of all claims to one ALJ and concerning *ex parte* communications between the ALJ and intermediaries are sufficient, at this stage, to create genuine issues of material fact.

Granted, the mass filings of these claims by plaintiffs created unique logistical concerns and the measures taken by the Secretary to enable efficient processing of them may, in fact, have been justified. Based on the present record, however, and granting plaintiffs the benefit of all reasonable inferences, it cannot be said that the evidence is so one-sided that a reasonable jury could only find in favor of the Secretary. See *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 251–52, 106 S.Ct. 2505, 2510, 2511–12, 91 L.Ed.2d 202 (1986); *Matsushita Elec. Ind. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986).

■■■ The unrefuted facts that all 1,165 claims were assigned to the same ALJ, that there were *"ex parte"* communications between the office of the ALJ and the intermediaries, and that all claims were uniformly denied without a hearing suggest that plaintiffs may have been denied consideration by a fair, impartial decisionmaker. As the Supreme Court observed in *Withrow v. Larkin*, 421 U.S. 35, 36, 95 S.Ct. 1456, 1458, 43 L.Ed.2d 712 (1975), a "fair trial in a fair tribunal is a basic requirement of due process," in administrative adjudicatory pro-

---

5. That is, the Court holds only that plaintiffs' failure to exhaust will not be allowed to defeat this Court's jurisdiction to consider the constitutional issues presented. This holding does not imply that the Secretary was not justified—or in the case of remand, would not be justified—in denying any or all of the claims for lack of exhaustion.

ceedings as well as in courts. "Not only is a biased decisionmaker constitutionally unacceptable, but 'our system of law has always endeavored to prevent even the probability of unfairness.'" *Id.*, at 47, 95 S.Ct. at 1464, quoting *In re Murchison*, 349 U.S. 133, 136, 75 S.Ct. 623, 625, 99 L.Ed. 942 (1955). Further, the evidence that the assignment of the claims and the intermediaries' communications with the ALJ's office were irregular is sufficient to facially rebut the presumption of regularity and integrity which the administrative process normally enjoys. See *Withrow*, 421 U.S. at 47, 95 S.Ct. at 1464.

The Court expresses no opinion as to whether these procedures reflect bias or resulted in bias or resulted in prejudice to any claim. It is clear only that the present record leaves material questions of fact unanswered. For these reasons, the Secretary's motion to dismiss or for summary judgment with respect to count I must be denied.

## IV. RELIEF

When the Court rendered its preliminary ruling to this effect on February 7, 1994, the Court inquired of counsel whether, in view of the remand of the count II claims, it might not be more efficient for the Secretary to also reconsider the count I claims, rather than proceed to trial on the due process issue. Counsel for the Secretary responded in the affirmative and counsel for DSS voiced no objection. Accordingly, the Court established a schedule whereby all the claims contained in counts I and II would be remanded to the Secretary for further consideration in light of the Court's rulings on standing, subject matter jurisdiction, exhaustion, and substantiality of the due process challenge.

The count II claims are to be reviewed in accordance with the instructions given *supra* at page 1122. The count I claims are to be re-evaluated by the Secretary in light of the Court's ruling, but otherwise without restriction. That is, the Court recognizes that DSS has not challenged the propriety of the Secretary's decisions on the count I claims, but has complained of the review procedure employed. The Court has found merely that DSS's constitutional challenge presents questions of fact and has directed remand of the

count I claims. The Court required in its bench ruling that the parties confer and try to agree on a proposed manner of expedited review within 30 days. Barring such an agreement, the Secretary was to undertake individualized review of the claims and complete the same within a period of ten months from February 7, 1994; that is, by November 7, 1994.

In the meantime, the Court has been informed that the parties have failed to reach agreement on a proposed manner of expedited review. In addition, the Secretary has sought clarification of the Court's ruling. This memorandum opinion incorporates the requested clarification. The parties shall, therefore, submit the instant claims to reevaluation consistent with the Court's preliminary ruling from the bench and this memorandum opinion.

An order consistent with this opinion shall issue forthwith.

## ORDER OF REMAND

In accordance with the Court's memorandum opinion of even date,

**IT IS HEREBY ORDERED** that the claims for reimbursement contained in counts I and II of the first amended complaint are **REMANDED** for reconsideration by the Secretary of the Department of Health and Human Services consistent with the Court's ruling, as embodied in the memorandum opinion. The Secretary shall complete this reconsideration and render her final decisions on the claims **not later than November 7, 1994.**